LEHMAN BROTHERS COMMERCIAL CORPORATION and Lehman Brothers Special Financing Inc., Plaintiffs,

v.

MINMETALS INTERNATIONAL NON–FERROUS METALS TRADING COMPANY and China National Metals and Minerals Import and Export Company, Defendants.

Minmetals International Non–Ferrous Metals Trading Company, Counterclaim Plaintiff,

v.

Lehman Brothers Inc., Lehman Brothers Asia Limited, Lehman Brothers Securities Asia Limited and Lehman Brothers Capital Co. (H.K.) Limited, Additional Counterclaim Defendants.

No. 94 Civ. 8301(JFK).

United States District Court, S.D. New York.

Aug. 10, 2000.

Cadwalader, Wickersham & Taft, Jonathan D. Polkes, of counsel, New York City, for Plaintiffs and Additional Counterclaim Defendants.

Kaye Scholer Fierman Hays & Handler, Aaron Rubinstein, of counsel, New York City, for Defendants and Additional Counterclaim Plaintiff.

### *OPINION and ORDER*

### *FILE UNDER SEAL*

KEENAN, District Judge.

Before the Court are cross-motions for summary judgment pursuant to Fed. R.Civ.P. 56. Defendants Minmetals International Non–Ferrous Metals Trading Company ("Non–Ferrous") and China National Metals & Minerals Import & Export Corporation ("Minmetals") move for summary judgment dismissing the Amended Complaint in this action, and Non–Ferrous moves to have judgment granted in favor

of its Eighth Counterclaim. Plaintiffs Lehman Brothers Commercial Corporation ("LBCC") and Lehman Brothers Special Financing, Inc. ("LBSF") move for the following: (1) summary judgment on Counts One, Two, Four, and Five of the Amended Complaint; and (2) summary judgment on the affirmative defenses asserted by Defendants, except for the affirmative defense claiming failure to mitigate damages. Counterclaim Defendants Lehman Brothers, Inc. ("Lehman"),[1] LBCC, LBSF, Lehman Brothers Asia Limited, Lehman Brothers Securities Asia Limited, and Lehman Brothers Capital Co. (H.K.) Limited also move for summary judgment on the counterclaims asserted by Non–Ferrous.

For the reasons that follow in this Opinion and Order, the Defendants' motion is denied. The motions by the Plaintiffs and the Counterclaim Defendants are granted in part and denied in part. The Court reserves decision on aspects of both sides' motions, as discussed in this Opinion and Order.

## BACKGROUND

From 1992 to 1994, Lehman subsidiaries were involved in a foreign-exchange ("FX") and swap-trading relationship with Hu Xiangdong ("Hu"), an employee of Non–Ferrous. Non–Ferrous was itself a subsidiary of Minmetals. This case for contract damages, tort damages, and declaratory relief stems from the demise of that relationship.

*The Parties*

Lehman is a global investment bank that offers a wide range of financial services. Lehman is headquartered in New York and maintains over thirty-five offices worldwide. LBCC is a booking vehicle for Lehman that books transactions in the foreign exchange markets. *See* Rubinstein Aff. in Supp. of Defendants' Mot. for Summ. J., Ex. 9, at 252, 418–19;[2] R1. Ex. 19, at 243, Ex. 3, at 16, 18–19. LBSF is a booking vehicle for Lehman that books interest-rate and other forms of swap transactions. *See* R1. Ex. 9 at 252, 407–08, Ex. 3 at 16, 18–19. Neither LBCC nor LBSF have any employees, offices, or telephones of their own. They both are Delaware corporations. As evidenced by the facts of this case, both LBCC and LBSF, at least some of the time, serve as principals in transactions with counterparties.[3]

Minmetals is the parent corporation of the Minmetals Group, an international trading conglomerate that conducts business throughout the world and trades in more than 100 countries and regions. *See* P1. Ex. 1. Minmetals is headquartered in Beijing in the People's Republic of China ("China"), is owned by the State, and re-

---

**1.** Because the Lehman Brothers entities involved in this case are part of the Lehman Brothers conglomerate, the Court will also use the shorthand reference "Lehman" when referring to Plaintiffs and/or Counterclaim Defendants collectively.

**2.** Exhibits annexed to the Rubinstein Affidavit in Support of Defendants' Motion will be cited as "R1. Ex. ___"; exhibits annexed to the Affidavit of Aaron Rubinstein in Opposition to Plaintiffs' Motion for Summary Judgment will be cited as "R2. Ex. ___"; exhibits annexed to the Reply Affidavit of Aaron Rubinstein will be cited as "R3. Ex. ___".

Similarly, exhibits annexed to the Affidavit of Jonathan Polkes in Support of Plaintiffs' Motion for Summary Judgment will be cited as "P1. Ex. ___"; exhibits annexed to the Affidavit of Jonathan Polkes in Opposition to Defendants' Motion for Summary Judgment will be cited as "P2. Ex. ___"; exhibits annexed to the Reply Affidavit of Jonathan Polkes will be cited as "P3. Ex. ___".

**3.** The record before the Court does not indicate whether LBCC and LBSF enter into principal transactions exclusively.

ports directly to China's Ministry of Foreign Trade and Economic Cooperation. *Id.* Non–Ferrous is a wholly-owned subsidiary of Minmetals and is located in the same building as Minmetals. *See* Pl. Exs. 2, 15.

*The Establishment of a Foreign Exchange Relationship*

Non–Ferrous initially opened an account with a Lehman affiliate—Lehman Brothers Commodities Limited ("LBCL")—sometime before the Fall of 1992 for trading on the London Metals Exchange ("LME"). After opening that account, Non–Ferrous sent LBCL communications identifying the Non–Ferrous employees that were authorized to place LME transactions through LBCL on Non–Ferrous' behalf. *See* R2. Ex. 15, at LM 3271, NF 1703, LM 32. Hu, an employee of Non–Ferrous, was not listed among those with authorization and had no role in opening the LME account.

In the Fall of 1992, Lehman personnel traveled to China as part of an active effort to solicit Chinese FX business. *See* R1. Ex. 13, at 174–77. During that trip, Lehman employees Timothy Potter, Jeremy Hodges, and May Tse met with Hu. Potter, an LBCC salesperson, went to Beijing to meet with Hu on the recommendation of a long-time customer. *See* Pl. Ex. 14, at 1354. Potter's customer had indicated that Hu wanted to establish an FX trading relationship with Lehman, and Potter made the trip in hopes of establishing such a relationship. *Id.* at 1354–55.

During the meeting, Hu presented his business card to Potter. The card read, at top, "China National Metals & Minerals Imp. & Exp. Corp." *See* Pl. Ex. 15. Directly under that heading, the card read, "International Non–Ferrous Metals Trading Co." *Id.* The card then identified Hu as "General Manager—Non–Ferrous Metals." *Id.*

Before that meeting in Beijing, Potter had met with James Bedford, an LBCL salesperson, to discuss LBCL's LME relationship with Non–Ferrous. *See* Pl. Ex. 14, at 1355. Potter learned from Bedford that Non–Ferrous was an established LME customer in good standing with LBCL. *Id.* at 1355–57. Although Lehman claims in its papers that Bedford confirmed at that time that Hu was an authorized trader for Non–Ferrous, neither Potter nor Bedford make such a claim. Bedford does not recall when Hu became authorized to trade for Non–Ferrous on the LME, and Potter has not stated that Bedford told him anything about Hu. *See* R2. Ex. 10 at 246–49; Pl. Ex. 14, at 1355–56.

At the Fall 1992 meeting, Potter reviewed Bedford's file on the Minmetals companies and noticed a Letter of Undertaking signed by both Minmetals and Non–Ferrous. The Letter of Undertaking indicated that the LME account was opened to allow Non–Ferrous to trade on the LME, and that Minmetals acted as Guarantor for any liabilities incurred by Non–Ferrous. *See* Pl. Ex. 17, at LM 000502. The Letter of Undertaking stated that LBCL was to place at Non–Ferrous' disposal "facilities in respect of [Non–Ferrous'] operations on all or any of the world's commodity, bullion, metal, securities, foreign exchange, index, financial instruments and options markets and future markets of any sort." *Id.*

After Hu's Beijing meeting with the Lehman personnel, Hu agreed to begin FX trading with LBCC on Non–Ferrous' behalf. This FX relationship in no way involved the LME account. Hu maintains that he agreed to commence FX trading because Lehman had been calling him regularly with market and trading advice and to recommend FX transactions to him.

Hu claims that in making his decision to begin FX trading, he relied on Lehman's representations that it would make specific recommendations to him and would execute his transactions at a favorable price. *See* Hu Aff. ¶ 18. Hu maintains that he did not understand that LBCC was to be a principal in these transactions; instead, he believed that LBCC was his agent and advisor, and that Potter and he were "a team." *Id.* ¶ 29.

The opening of Non–Ferrous' FX trading account with LBCC did not proceed smoothly. On November 26, 1992, Hu executed a Commodity Terms and Conditions Agreement and Supplement. *See* P1. Ex. 19. Hu executed the agreement in China and faxed a copy to Potter in London. Although the fax cover sheet was written on Minmetals letterhead, it was clearly sent by Non–Ferrous, even though it was faxed after normal business hours from the offices of a company unrelated to either Minmetals or Non–Ferrous. *See id.;* R2. Ex. 23, at 728–31.

The FX account was opened in Minmetals' name: "China National Metals and Minerals Imp + Exp Corp." *See* P1. Ex. 19. Potter claims that he used Minmetals' name in the agreement because Hu had instructed him to do so. *See* R2. Ex. 23, at 727–29. Hu, on the other hand, claims that he had intended to open the account in Non–Ferrous' name. *See* Hu Aff. ¶ 26. Hu states that Potter told him that he would fill out the account title for him, and Hu assumed that Potter would use Non–Ferrous' name. Hu says he signed the agreement without realizing that Potter had used Minmetals' name on that agreement. *Id.* ¶¶ 26–27.

Hu claims that within two weeks after signing the agreement and after the initial FX transaction was placed,[4] he realized that Potter had used Minmetals' name rather than Non–Ferrous' name. Hu says that when he told Potter of the mistake, Potter assured him that he would quickly correct it. *Id.* ¶ 27. Potter states that Hu directed him to transfer the account from Minmetals to Non–Ferrous. *See* P1. Ex. 21.

In any event, on December 8, 1992, Hu executed an identical Commodity Terms and Conditions Agreement and Supplement in Non–Ferrous' name. *See* P1. Ex. 22. Hu executed the agreement in China and faxed it on Non–Ferrous letterhead from Non–Ferrous' office to Potter in London. The agreement designated New York law as its governing law and provided for Non–Ferrous' payment of collateral—known as margin—under certain circumstances. The agreement stated that Lehman would have the right to liquidate its transactions with Non–Ferrous in the event that Non–Ferrous did not meet its margin obligations. *See* P1. Ex. 24. It required that Non–Ferrous pay any deficiencies remaining after such a liquidation. *Id.*

At the same time that Hu executed the second agreement, he also signed a purported guarantee from Minmetals (the "Guarantee"). *See* P1. Ex. 22, at LM 00029. The Guarantee was drafted by Lehman and then signed by Hu as "General Manager." *See* R1. Ex. 3, at 24; P1. Ex. 22, at LM 00029. Hu claims that he signed the Guarantee because Lehman re-

---

4. Hu's first FX transaction was an FX option contract. An FX option contract is an agreement whereby a seller, in return for a payment, obligates itself to deliver to a buyer, on a specific date in the future, a specific amount of foreign currency at a specified price. De-
pending upon market conditions, the purchaser of the option will either exercise the option and require the seller to perform its obligation, or allow the option to expire worthless.

quired this form for him to trade. He states that he did not have the authority to do so because he never worked for Minmetals. *See* Hu Aff. ¶ 28. Hu claims that he asked Potter how he could guarantee his own trading, to which Potter replied, "[D]on't worry about it, it is just a form needed for the files." *Id.*

After Hu executed the Commodity Terms and Conditions Agreement, neither anyone in Lehman's Credit Department nor any of Lehman's FX salespeople sought any evidence that Hu had the authority to open an FX account on Non–Ferrous' behalf. *See, e.g.,* R1. Ex. 9, at 72–73; R2. Ex. 33, at 74, Ex. 23, at 367–68, 424. Nor did anyone at Lehman inquire about or obtain any governmental license or authorization for FX trading from Hu, even though its credit personnel and salespeople apparently understood that some form of governmental authorization was needed. *See* R1. Ex. 9, at 61, Ex. 10, at 102–03, Ex. 5, at 105, Ex. 12, at 76. Lehman's Credit Department disclaimed responsibility for making such an inquiry, and its Commodity Administration Department did the same. *See* R1. Ex. 9, at 220–21, Ex. 18, at 162–63, Ex. 19, at 98–99, Ex. 20, at 120–21.

Despite this lack of due diligence, Lehman's Credit Department allowed Non–Ferrous to hold positions of up to $50 million. *See* R2. Ex. 39. Lehman increased this limit to $100 million within a few weeks' time, and eventually increased it to $1 billion. *See* R2. Ex. 40–42, 17. Lehman's Credit Department approved these increases without ever examining a financial statement or communicating with anyone at Non–Ferrous about Hu's trading. *See* R2. Ex. 33, at 44, 99–100, 138–39, 529–30. Lehman's Credit Department's

decisions to do FX business with Non–Ferrous and increase Non–Ferrous' position limits were made on a "business-decision" basis, which meant that Lehman was prepared to do business with Non–Ferrous even without the financial information that was needed for an informed credit determination. *See* R2. Ex. 33, at 44–45, Ex. 44, at 57–59.

*The Progression of Non–Ferrous' FX Trading*

Hu was promoted to the position of General Manager of Non–Ferrous' Futures Department in February 1993. According to LBCL, that was the first date that Hu began trading for Non–Ferrous' LME account. *See* R2. Ex. 20. Consistent with its practice, Non–Ferrous sent LBCL a letter dated February 2, 1993 authorizing Hu to trade for Non–Ferrous' LME account. *See* R2. Ex. 19. The letter was signed by a vice-president of Non–Ferrous, Guo Xianqian. *Id.*

Throughout 1993, Hu entered into many FX transactions with LBCC. During this time, Hu engaged in FX options, forwards, and spot transactions.[5] Hu claims that he branched out into forward and spot trading at Lehman's urging and suggestion of more lucrative profits. *See* Hu Aff. ¶ 62. These transactions proceeded smoothly. Throughout 1993, whenever Non–Ferrous' FX trading generated a margin call, the required funds were provided promptly. *See* P1. Ex. 25. By February 1994, Non–Ferrous had earned over $30 million from its FX trading with Lehman.

Between late 1993 and early 1994, Cao Yongfang ("Cao"), President of Non–Ferrous, signed three money-transfer forms directing more than $42 million into Non–Ferrous' FX account at Lehman. *See* P1.

---

5. Spot and forward FX contracts are agreements that require the delivery of a specified quantity of foreign currency in return for the payment of a mutually agreed price on a date in the future.

Ex. 33. The transferred funds came from a larger amount that China's State Reserve Bank had transferred to Non–Ferrous in order to purchase copper. Non–Ferrous admits that Cao authorized these transfers, but maintains that Cao thought the money would go into Non–Ferrous' LME account at Lehman rather than Hu's FX account. *See* Cao Aff. ¶¶ 16–18.

Hu claims that he transferred the $42 million into Non–Ferrous' FX account after arranging a favorable interest-rate deal with May Tse at Lehman. *See* Hu Aff. ¶ 59. After Lehman agreed to pay the favorable interest rate, Hu informed Cao that he had arranged such a deal, but he led Cao to believe that the money would be deposited in the LME account. *Id.* ¶¶ 59–60; Cao Aff. ¶¶ 21–24. Based on these representations by Hu, Cao authorized the transfers of $42 million and had Hu prepare the paperwork. *See* Hu Aff. ¶ 60; Cao Aff. ¶¶ 22–23. Cao claims that he signed off on the transfers because as far as he knew, Non–Ferrous had only one account with Lehman—the LME account. *See* Cao Aff. ¶¶ 23–24.

Hu realized that by having this money transferred into the FX account at Lehman, he could increase his trading volume and still be protected against margin calls. *See* Hu Aff. ¶ 63. After the transfer, Lehman increased Hu's trading limit to $1 billion. *See* R2. Ex. 17. Hu's FX trading volume grew in response to this increase.

From 1993 to early 1994, Hu's trades earned profits. On two occasions between November 1993 and January 1994, Hu directed Lehman to transfer some of his profits to third parties. In November 1993, Hu asked Potter to transfer $5.1 million from the Non–Ferrous account to an account in Brooklyn under the name Sinormet. On November 18, 1993, Lehman transferred the money to Sinormet's Citibank account. *See* R2. Ex. 84; Hu Aff.

¶¶ 69–70. Sinormet was an entity that Hu claims he created in private. Hu Aff. ¶¶ 68–69. Hu states that he had no authority to order this transfer, that it was done without the knowledge of anyone at Non–Ferrous, and that nobody at Lehman questioned him or investigated why he ordered a transfer to a third party. *Id.* ¶¶ 69–70.

In January 1994, Hu directed Lehman to transfer $10.2 million from the FX account to the account of Senior Market Ltd. On January 31, 1994, Lehman transferred the money to Senior Market's account. *See* R2. Ex. 85; Hu Aff. ¶ 71. Senior Market was a company controlled by the same client of Potter who first introduced Hu to Potter in 1992. *See* Hu Aff. ¶ 71. Again, Hu claims he had no authority to order such a transfer, that the transfer was done without the knowledge of anyone at Non–Ferrous, and that Lehman simply transferred the money without inquiring into why the money was being transferred to a third party. *Id.* ¶ 72.

Hu maintains that throughout his FX trading with LBCC he relied upon the advice and recommendations of Potter and his FX colleagues, along with that of Lehman economists. *Id.* ¶ 30. He claims that he trusted and followed that advice because he believed in the integrity of Potter and Lehman. *Id.* He claims that Lehman promised to give him fair pricing and offer him better prices than other small investors. *Id.* ¶¶ 32–33. Hu maintains that he had no access to the FX market except through Lehman, and thus relied on Lehman to keep him apprised of how his transactions were faring. *Id.* ¶ 36. All in all, Hu believed, based on what Lehman told him, that Lehman was his "trusted broker, doing its best to maximize [Hu's] profits." *Id.* ¶ 33.

Lehman disputes Hu's account of the FX relationship between LBCC and Non–

Ferrous. Lehman denies that it behaved any differently from any FX dealer that enters into principal transactions with counterparties. *See, e.g.,* Pl. Ex. 26. Lehman claims that it was clear that LBCC and Non–Ferrous were dealing with each other at arm's length, with each party as a principal to the FX transaction. *See, e.g.,* Pl. Ex. 31. Lehman claims that Non–Ferrous always made its own decisions about pricing and trades, and that it never delegated discretionary trading authority to Lehman. Lehman claims that it merely described market conditions, gave certain opinions, and made suggestions, and that the ultimate trading authority rested with Non–Ferrous. *See* Pl. Ex. 26.

*Non–Ferrous' Swap Transactions*

During the time that the State Reserve Bank money was transferred to Non–Ferrous' FX account at Lehman, Hu opened yet a third account (the "Swap Account"). Hu entered into two interest-rate swap transactions with LBSF.[6] Lehman claims that Hu proposed the idea of an interest-rate swap in an effort to boost the FX account's rate of return. *See* Pl. Ex. 34. Hu claims that once the money was transferred, Lehman employees approached him about entering into all sorts of derivative transactions. *See* Hu Aff. ¶¶ 76–77. Lehman allegedly urged Hu not to keep the money in the FX account, saying, "only old ladies put their money in cash accounts." *Id.* ¶ 76.

George Koo was the LBSF salesman who primarily handled Hu's swap trading. Hu maintains that Koo pitched interest-rate swaps as safe investments that were guaranteed to return a good yield. *Id.*

¶ 78. In November 1993, Hu entered into an interest-rate swap transaction with LBSF. Hu documented the swap by executing a confirmation in China. *See* Pl. Ex. 38. The confirmation stated that New York law governed the transaction, and contained a clause that permitted either party to terminate the swap if its exposure exceeded $5 million at any given time and margin was not posted to meet that exposure. *Id.*

The November swap was a two-year bet on the movement of German interest rates. *See* R2. Ex. 57, at 8. The notional amount of the swap, the amount upon which the swap payoff is based, was listed on the swap confirmation as $50 million. But, because of a leverage factor in the swap's formula, the actual notional amount was $500 million. *See* Pl. Ex. 38. Hu claims that he did not know about the leverage, and that Lehman never explained to him that the swap transaction was leveraged. *See* Hu Aff. ¶ 79.

After Hu entered into the first swap, Lehman told Hu that it needed a letter from his boss authorizing him to engage in swap transactions. To that end, Lehman allegedly drafted an authorization letter for Cao to sign, and sent it to Hu. *Id.* ¶ 80. Hu, knowing that Cao could not read English, told Cao that his signature was needed to effectuate the higher rate of interest that Hu had told Cao that Non–Ferrous would earn. *Id.* Cao signed the letter, thinking that it would help return a higher interest rate on Non–Ferrous' LME account. *See* Cao Aff. ¶ 25. Cao claims that nobody from Lehman contact-

---

**6.** In a swap transaction, two parties commit to exchange payment flows with each other based upon mutually agreed indices, such as interest rates or foreign exchange rates. Payments are exchanged on dates specified in the agreement. Swap agreements typically pro-vide for the posting of collateral to secure a party's exposure and for the early termination of a swap transaction if one party's exposure grows too large, as defined by the agreements between the parties.

ed him about this authorization letter. *Id.* ¶ 27.

Hu claims that after he entered into the first swap transaction, Lehman continued to propose swap transactions to him. *See* Hu Aff. ¶ 87. In February 1994, Hu eventually entered into another interest-rate swap with LBSF. This transaction was a one-year bet involving the movement of interest rates in Japan. This transaction was also leveraged, this time with a leverage factor of fifteen. *See* Pl. Ex. 39. Therefore, the notional amount was $450 million, not the $30 million listed on the confirmation. Again, Hu claimed that he had no knowledge of the leverage, and that Lehman never explained it to him. *See* Hu Aff. ¶ 83.

Shortly after entering into the second interest-rate swap, Hu became concerned about the swap's value. When Lehman advised him of a temporary market movement in his favor that would enable Hu to get out of the swap, Hu agreed to terminate the transaction. *See* Pl. Ex. 40; Hu Aff. ¶ 88. Lehman paid Hu a termination fee of $50,000.

Lehman's establishment of Non–Ferrous' swap-trading account was characterized, like its handling of the FX account, by certain irregularities. According to Lehman policy, Lehman commonly documented swaps it booked by entering into an International Swap Dealers Association ("ISDA") Master Agreement with the party to whom it sold the swap. *See* R2. Ex. 36, at LM 16024. After entering into the first swap with Hu, Lehman asked him to execute an ISDA Master Agreement.

Although Lehman prepared a draft of the agreement, Hu never executed it. *See* R2. Ex. 38, at LM 924–60, Ex. 101, at ML 210; Hu Aff. ¶ 86. As a result, Hu never provided Lehman with certain documents that the ISDA Master Agreement required from Non–Ferrous. These documents included copies of Non–Ferrous' business license and articles of association, as well as the "[a]pproval of each transaction by the State Administration of Exchange Control." *See* R2. Ex. 38, at LM 946. Under the ISDA Master Agreement, therefore, Lehman was supposed to obtain proof of such approval on or before entering into the swap transaction. *Id.*

Lehman's Credit Department approved the swap transactions with Non–Ferrous without ever investigating Non–Ferrous. George Koo admitted that the Credit Department's approval resulted from the pressure he himself placed on the credit officer, combined with the strength of the Non–Ferrous name. *See* R2. Ex. 51.

Potter remained in close contact with Hu during Hu's association with Lehman's swap personnel and attempted to protect him from risky transactions involving swaps. For example, in May 1994, Lehman's swap personnel approached Hu about restructuring his Deutsche Bull Swap. Potter, upon hearing of this, became worried that the deal was too risky for Hu because he felt that Non–Ferrous "[was not] so sophisticated." *See* R2. Ex. 120, at 199. Potter believed that the transaction was "absolutely ridiculous," and therefore decided to advise Hu against it. *See* R2. Ex. 119, at 376. Potter was confident that he could persuade Hu not to enter into the restructuring because of his "very strong relationship" with Hu. *See* R2. Ex. 120, at 199. He subsequently advised Hu not to enter into the restructuring because of the risk, and Hu followed his advice. *See* R2. Ex. 122, at 212–13, Ex. 123, at 403–04.

The swap restructuring incident is not the only example of Potter's strong relationship with Hu. As Sheng Yan, an LBSF salesperson, commented to Potter after his initial meeting with Hu, "I'm pretty impressed, actually. I mean, obviously you

are very good friends." *See* R2. Ex. 28, at 99. Potter acknowledged the strength of his relationship with Hu, and stated that he had "quite a strong relationship on the currency side" with Hu. *Id.* In a report to his boss, Potter noted that Hu "trades cash FX and options, on our ideas." *See* R2. Ex. 25, at 14767.

Hu maintains that his FX and swap trading accounts with Lehman were not authorized by Non–Ferrous, and that throughout his trading with Lehman, he was the only person that Lehman dealt with at Non–Ferrous. *See* Hu Aff. ¶¶ 22–23, 40–50. Hu claims that nobody at Lehman ever demanded any proof of his authority to trade FX with Lehman on Non–Ferrous' behalf. *Id.* ¶ 40.

Lehman disputes Hu's claim that he lacked authorization from Non–Ferrous. However, Lehman has not shown that anyone from its credit or operations departments communicated with anyone at Non–Ferrous other than Hu concerning the FX or swap trading. Andrew Fately, Lehman's head of FX options trading, cannot recall the name of anyone at Non–Ferrous other than Hu. *See* R2. Ex. 92, at 138–39. Potter admits that he never spoke with anyone at Non–Ferrous other than Hu until the end of July 1994. *See* R2. Ex. 23, at 367–68, 484. Potter also admits that nobody in Lehman's FX department ever met with Cao before August 1994. *See* R2. Ex. 94, at 00012. Neither Yang Shen nor George Koo, the two swap salespeople that dealt with Non–Ferrous, ever met or communicated with Cao during the period of Hu's trading. *See* R2. Ex. 95, at 94, Ex. 13, at 495.

*The Margin–Call Crisis*

In 1994, the United States Federal Reserve Board (the "Fed") began a series of interest-rate hikes that dramatically raised interest rates in the United States. The Fed's actions caused the dollar's value to fall and, as a result, market participants who had anticipated a strong dollar incurred substantial losses in their transactions. The Fed's actions caused losses in Non–Ferrous' FX and swap positions. By June 1994, Non–Ferrous' collateral in the FX account (the money that was transferred initially by the State Reserve Bank) was used up, and Lehman issued a series of margin calls to Non–Ferrous. These margin calls eventually totaled over $46 million. *See* R2. Ex. 127.

On June 23, 1994, Hu agreed to a payment schedule under which the margin calls would be met by a series of installment payments. *See* P1. Ex. 44. Lehman received one payment of $5.1 million on June 24, 1994, *see* P1. Ex. 45, but Hu subsequently failed to keep up with the rest of the installment plan. During this time, no one at Lehman attempted to contact anyone at Non–Ferrous other than Hu. *See* R2. Ex. 31, at LM 18235–37.

In late July 1994, Lehman contacted Cao because it was no longer able to reach Hu. Lehman states that after it contacted Cao, Cao sent Lehman a letter taking the position that Hu's activities in FX and swap trading were unauthorized. *See* P1. Ex. 47.

According to Hu, Hu realized by mid-July that his hopes for a market recovery were futile, and thus confessed all of his unauthorized trading to Cao. *See* Hu Aff. ¶¶ 113–14. Cao claims that this confession was the first he heard of Hu's FX and swap trading, or of the existence of these accounts. *See* Cao Aff. ¶ 29. Cao states that the confession prompted him to write his letter to Lehman, and that Lehman did not call him until after that letter was sent. *Id.* ¶¶ 32–34.

On August 1, 1994, Lehman liquidated the outstanding FX transactions and the first swap transaction. The proceeds from

the liquidation went to satisfy Non–Ferrous' margin calls, but Non–Ferrous still owed Lehman $44.75 million for the FX transactions and $8.8 million for the swap transaction. *See* Pl. Ex. 51. Lehman, through its subsidiaries LBCC and LBSF, brought the instant action when Non–Ferrous and Minmetals refused to pay the amounts outstanding and the parties' attempts to resolve the matter without litigation failed.

*Liquidation of the Thai NCDs*

During the period Hu traded with Lehman, he also purchased negotiable certificates of deposit ("NCDs") issued by two Thai banks and underwritten by Lehman. Hu claims that he was never advised of the risks associated with these NCDs, and that he did not understand the nature of these investments. *See* Hu Aff. ¶ 90. He states that Lehman never informed him that it was the underwriter of the NCDs; nor did it inform him of the deteriorating value of these investments. *Id.* ¶¶ 93–94. Lehman eventually sent its personnel to China in June 1994 to explain these investments to Hu. *Id.* ¶¶ 95–96; R2. Ex. 110.

Hu states that after he confessed his unauthorized trading to Cao in July 1994, Cao ordered him to liquidate the NCDs. Hu claims that soon afterwards, he prepared a letter for Cao to sign directing the immediate liquidation of the NCDs and the transfer of those proceeds to Non–Ferrous' LME account. *See* Hu Aff. ¶¶ 115–16. This occurred before Lehman liquidated the FX and swap transactions.

*The Current Litigation*

In its Amended Complaint, Lehman asserts the following five claims against the Defendants: (1) Non–Ferrous breached its FX contract with LBCC; (2) Non–Ferrous breached its swap contract with LBSF; (3)

Minmetals breached its guarantee of Non–Ferrous' FX transactions; (4) Minmetals is liable for the FX transactions of its alter ego, Non–Ferrous; and (5) Minmetals is liable for the swap transactions of its alter ego, Non–Ferrous.

The Defendants have asserted the following eighteen affirmative defenses against Lehman's claims: (1) Lehman failed to state a claim upon which relief can be granted; (2) the transactions at issue were not authorized; (3) Lehman was negligent and breached its fiduciary duties; (4) Lehman inequitably failed to advise Non–Ferrous of the risks of the transactions at issue; (5) Lehman committed fraud and misrepresentations; (6) the transactions at issue were illegal; (7) Lehman's claims are barred by the doctrine of unclean hands; (8) Lehman provided information that was incorrect and misleading; (9) Lehman breached the contracts at issue; (10) the contracts at issue lack consideration; (11) Lehman's claims are barred by the doctrines of mutual or unilateral mistake; (12) the transactions were in violation of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.;* (13) Lehman's claims are barred by the doctrines of estoppel and equitable estoppel; (14) Lehman's claims are barred by the doctrine of laches; (15) Lehman's claims are barred by the doctrine of waiver; (16) Lehman failed to mitigate its damages; (17) this Court lacks personal jurisdiction over the Defendants; and (18) in essence, Lehman acted unfairly and deceitfully.[7]

Non–Ferrous has also asserted the following fourteen counterclaims against Lehman: (1) the transactions at issue were unauthorized; (2) Lehman breached its fiduciary duties; (3) Lehman aided, abetted, and induced a breach of fiduciary duty; (4)

---

**7.** This affirmative defense appears as the "Twentieth Affirmative Defense" in the parties' papers, and will be referred to as such by the Court.

Lehman was negligent; (5) Lehman committed fraud; (6) Lehman committed negligent misrepresentations; (7) Lehman breached the contracts at issue; (8) the transactions were illegal; (9) the swap agreement contained additional terms understood by both parties; (10) Lehman committed willful deception, fraud, and cheating in violation of § 4b of the Commodity Exchange Act, 7 U.S.C. § 6b; (11) Lehman devised a scheme or artifice to defraud in violation of § 4o of the Commodity Exchange Act, 7 U.S.C. § 6o; (12) Lehman committed deception, cheating, and fraud in violation of § 32.9 of the Rules of the Commodity Futures Trading Commission, 17 C.F.R. § 32.9; (13) Lehman violated § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5; and (14) Lehman committed conversion.

After years of contentious discovery and pre-trial practice, the parties cross-moved for summary judgment as stated in the introductory paragraph of this Opinion and Order. For the reasons that follow, the Defendants' motion for summary judgment is denied with respect to Counts One, Two, Four, and Five of Lehman's Amended Complaint. The Court reserves decision with respect to Count Three in accordance with the rulings in this Opinion and Order.

Lehman's motion for summary judgment is granted in part and denied in part. Summary judgment is granted with respect to the following affirmative defenses: the Fourth, the Seventh, the Ninth, the Tenth, the Thirteenth, the Fourteenth, the Fifteenth, the Seventeenth, and the Twentieth. Summary judgment is also granted with respect to Non–Ferrous' Seventh and Twelfth Counterclaims. The Court reserves decision with respect to Non–Ferrous' Fifth and Thirteenth Counterclaims in accordance with the rulings in this Opinion and Order. Summary judgment is denied with respect to all other affirmative defenses and counterclaims.

## DISCUSSION

### I. Summary Judgment Standards

This Court may grant summary judgment only if the moving party is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact. *See, e.g., Silver v. City Univ. of New York,* 947 F.2d 1021, 1022 (2d Cir.1991); *Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986); *Falls Riverway Realty, Inc. v. Niagara Falls,* 754 F.2d 49, 54 (2d Cir. 1985). The role of the Court on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight,* 804 F.2d at 11; *see also First Fed. Sav. & Loan Ass'n,* 869 F.2d at 103 (stating that to resolve a summary judgment motion properly, a court must conclude that there are no genuine issues of material fact, and that all inferences must be drawn in favor of the non-moving party); *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989) (same).

The movant bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions to file, together with affidavits, if any," that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant meets this initial burden, the party opposing the motion must then demonstrate that there exists a genuine dispute as to the material facts. *Id.; see also Silver,* 947 F.2d at 1022;

*Greater Buffalo Press, Inc. v. Federal Reserve Bank,* 866 F.2d 38, 42 (2d Cir.1989).

The opposing party may not solely rely on its pleadings, on conclusory factual allegations, or on conjecture as to the facts that discovery might disclose. *See, e.g., Gray v. Darien,* 927 F.2d 69, 74 (2d Cir. 1991). Rather, the opposing party must present specific evidence supporting its contention that there is a genuine material issue of fact. *See, e.g., Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Twin Lab. Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990); *First Fed. Sav. & Loan Ass'n,* 869 F.2d at 103; *Knight,* 804 F.2d at 12; *L & L Started Pullets, Inc. v. Gourdine,* 762 F.2d 1, 3–4 (2d Cir.1985).

To show such a "genuine dispute," the opposing party must come forward with enough evidence to allow a reasonable jury to return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Cinema North Corp. v. Plaza at Latham Assocs.,* 867 F.2d 135, 138 (2d Cir.1989). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," then summary judgment must be denied. *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9–10 (2d Cir.1983) (citing *New York State Energy Research & Dev. Auth. v. Nuclear Fuel Servs., Inc.,* 666 F.2d 787, 790 (2d Cir.1981)). The Court will analyze the parties' cross-motions in accordance with these principles.

## II. The Defendants' Motion

The Defendants move for summary judgment dismissing Lehman's Amended Complaint in this case. Non–Ferrous also moves for summary judgment on its Eighth Counterclaim, which alleges that the transactions at issue were illegal. The Court will treat the Defendants' motion under the following headings: (A) Choice of Law; (B) Illegality and Enforceability; (C) IMF Agreement; and (D) the Guarantee Claim.

### A. Choice of Law

■ Federal courts sitting in diversity in New York must apply New York's choice-of-law rules when determining the law that governs a contract. *See Dornberger v. Metropolitan Life Ins. Co.,* 961 F.Supp. 506, 530 (S.D.N.Y.1997). Although New York has traditionally followed common-law principles in its approach to contractual choice-of-law clauses, it now requires, by statute, that courts enforce the parties' selection of New York law in commercial contracts of $250,000 or more. *See* N.Y. Gen. Oblig. Law § 5–1401. The power of courts to enforce that choice, however, remains restricted within constitutional bounds.

■ In the Defendants' bid to set aside the selection of New York law in Non–Ferrous' agreement with Lehman, they have not apprised this Court of any such constitutional restriction in this case. This Court must therefore follow § 5–1401 and uphold the selection of New York law as the law governing the contract.

■ Under traditional New York choice-of-law rules, courts looked to common-law principles to determine the law governing a contract, even for a contract containing a choice-of-law clause. *See Haag v. Barnes,* 9 N.Y.2d 554, 216 N.Y.S.2d 65, 175 N.E.2d 441 (1961) (applying a grouping-of-contracts test); *A.S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957) (applying a reasonable-relation test). Common-law principles limit the effect of a choice-of-law clause where (1) there is no

reasonable basis for the parties' choice, or (2) the application of the chosen law would violate a fundamental public policy of another, more-interested jurisdiction. *See* Restatement (Second) Conflict of Laws § 187(2).[8]

In 1984, New York modified its common-law approach to choice-of-law clauses and embraced party autonomy by enacting General Obligation Law Section 5–1401 ("§ 5–1401"). *See* N.Y. Gen. Oblig. Law § 5–1401. By doing so, New York sought to secure and augment its reputation as a center of international commerce. *See* Edith Friedler, *Party Autonomy Revisited: A Statutory Solution To a Choice-of-Law Problem*, 37 Kan. L.Rev. 471, 497–98 (1989). Section 5–1401 states that for commercial contracts of at least $250,000, the parties' selection of New York law in the contract is enforceable even if the transaction itself bears no reasonable relation to New York. *See* N.Y. Gen. Oblig. Law § 5–1401.[9]

Despite the apparently broad sweep of § 5–1401, the Defendants argue that the statute's effect remains limited by the public-policy principle reported in § 187(2)(b) of the Restatement. The Defendants support this proposition by noting that although the legislative history to § 5–1401 expressly indicates an intent to modify other common-law conflicts principles, it does not similarly indicate any modification of the public-policy principle of Restatement § 187(2)(b). *See* Defendants' Reply Mem. at 20 n. 26.

This proposition that Restatement § 187(2)(b) limits the effect of § 5–1401 was flatly rejected in *Supply & Building Co. v. Estee Lauder International, Inc.* *See* No. 95 Civ. 8136, 2000 WL 223838 (S.D.N.Y. Feb.25, 2000) (applying New York law, as selected in the contract, rather than Kuwaiti law). In *Supply & Building,* Judge Casey stated that "Section 5–1401 is a broad choice of law provision clearly written to leave no doubt that New York substantive law applies when it is

---

8. Section 187(2) of the Restatement (Second) Conflict of Laws ("Restatement") states the following:

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) Conflict of Laws § 187(2).

9. Section 5–1401 reads as follows:

(1) The parties to any contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars ... may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to this state. This section shall not apply to any contract, agreement or undertaking (a) for labor or personal services, (b) relating to any transaction for personal, family or household services, or © to the extent provided to the contrary in subsection two of section 1–105 of the uniform commercial code.

(2) Nothing contained in this section shall be construed to limit or deny the enforcement of any provision respecting choice of law in any other contract, agreement or undertaking.

N.Y. Gen. Oblig. Law § 5–1401.

provided for in certain contracts." *Id.* at *3. The court noted that § 5–1401 codifies New York's "strong public policy interest" in enforcing parties' contractual selections of New York law. *Id.* Therefore, because the statute clearly does not include an exception for violations of another jurisdiction's public policy, the court rejected that proposed limitation. *Id.*

This Court agrees that § 5–1401 is not limited by Restatement § 187(2)(b). Section 5–1401 is clear on its face, and thus there is no need to look beyond its own provisions to resolve any ambiguity in its meaning. What is not said on the floor of the Legislature cannot override the plain meaning of what is said in the statute, and therefore this Court concurs with Judge Casey's holding in *Supply & Building.* Nevertheless, Section 5–1401 itself is not without its limits. Although the statute supersedes common-law conflicts principles, it must still remain within constitutional bounds.

■ A court's power to apply its own state's law in a case that affects another U.S. state is limited by both due process and the Full Faith and Credit Clause. *See Allstate Insurance Co. v. Hague,* 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). However, the Supreme Court has indicated that the key inquiry ultimately is whether a court's application of its own state's law is arbitrary or fundamentally unfair. *See* Friedler, *supra,* at 499. Under this analysis, a court's power to apply its own state's law might be virtually unlimited when done pursuant to the parties' own contractual choice. *See id.* at 499–500. It remains to be seen, however, whether a state with *no* connection to either the parties or the transactions could apply its own law, consonant with the Full Faith and Credit Clause, when doing so would violate an important public policy of a more-interested state. *See id.* at 501;

Barry W. Rashkover, Note, *Title 14, New York Choice of Law Rule For Contractual Disputes: Avoiding the Unreasonable Results,* 71 Cornell L.Rev. 227, 240 (1985).

The constitutional limits are less clear, but perhaps more controversial, when a state applies its own law to transactions that affect foreign nations. *See* Friedler, *supra,* at 512; Christopher L. Ingrim, *Choice-of-Law Clauses: Their Effect on Extraterritorial Analysis—A Scholar's Dream, A Practitioner's Nightmare,* 28 Creighton L.Rev. 663 (1995). Commentators have surmised that the constitutional limits in those situations are derived from the concept of comity. *See* Friedler, *supra,* at 512.

Comity, essentially, refers to the deference one nation shows to the laws of another nation, "having due regard both to international duty and convenience and to the rights of its own citizens or of other persons who are under the protections of its laws." *See* Black's Law Dictionary (6th ed.1990). The connection between comity and constitutional obligation is not clearly defined, since the comity concept itself lies somewhere in between an absolute international obligation and a mere courtesy. *See* Ingrim, *supra,* at 668 (discussing *Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895)).

The Defendants have not raised any constitutional restrictions upon this Court's ability to enforce the parties' selection of New York law in the contract, as required by § 5–1401. Moreover, no such restrictions are apparent under these circumstances. This is not a case involving parties or transactions without any connection to New York. Lehman is headquartered in New York and the transactions and payments occurred, at least in part, in New York.

Instead, the Defendants stress China's public-policy interest in regulating its foreign exchange. They explain, with the zeal of the newly-converted, the importance of China's licensing requirements to protecting that interest. They therefore urge this Court to respect that policy and to set aside, pursuant to Restatement principles, the selection of New York law in Non–Ferrous' agreement with Lehman.

Although the public policy behind China's licensing requirements is no doubt strong, § 5–1401 implicates other policies that are vitally important not only to contracting parties but also to New York and to the international community. The Supreme Court has signaled its support for choice-of-law clauses in international contracts because of their importance to international commerce. *See Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 516, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). In enforcing an arbitration agreement in *Scherk*, the Court described choice-of-law and forum-selection clauses in international contracts as "almost indispensable precondition[s] to achievement of the orderliness and predictability essential to any international business transaction." *Id.*

The *Scherk* Court's emphasis on the need to ensure "orderliness and predictability" in international commerce has been echoed by the Ninth Circuit. *See Northrop Corp. v. Triad Int'l Mktg., S.A.*, 811 F.2d 1265 (9th Cir.1987). In *Northrop*, a case analogous to this one, the plaintiff agreed to be the defendant's exclusive marketer of military aircraft to Saudi Arabia's air force in return for commissions on all sales. *Id.* Following a subsequent Saudi decree that prohibited the payment of commissions on arms sales, the defendant refused to pay the commissions it owed the plaintiff under the agreement. *Id.* at 1266–67.

Although the parties in *Northrop* had originally selected California law in their contract, the defendant argued, pursuant to Restatement § 187(2)(b), that an application of California law would violate the Saudi public policy prohibiting commissions on arms sales. *Id.* at 1270. The court upheld the parties' original selection of California law, holding that because of the interest stated in *Scherk*, choice-of-law clauses in international contracts "should be enforced absent strong reasons to set them aside." *Id.*

This Court need not choose from among these various interests, for the New York State Legislature has already done so by enacting § 5–1401. This Court, therefore, need only follow § 5–1401 and enforce the parties' contractual selection of New York law, absent any constitutional restrictions on that enforcement. As previously noted, the Defendants have not apprised the Court of any such restrictions, nor are any such restrictions apparent in this case. As a result, this Court rules that acquiescence to the command of the New York State Legislature, and to the selection of the parties themselves, is proper in this case.

### B. Illegality and Enforceability

■ The fact that New York law governs the parties' contract does not necessarily mean that the contract is enforceable; New York law does not ignore an illegality in China. A contract that is illegal in its place of performance is unenforceable in New York if the parties entered into the contract with a view to violate the laws of that other jurisdiction. *See Rutkin v. Reinfeld*, 229 F.2d 248, 255–56 (2d Cir.1956); *Dornberger v. Metropolitan Life Ins. Co.*, 961 F.Supp. 506, 533–35 (S.D.N.Y.1997); *Hesslein v. Matzner*, 19 N.Y.S.2d 462, 463–64 (N.Y.City Ct.1940).

Therefore, even if Lehman's contracts with Non–Ferrous could have been legally

performed in New York, they are not enforceable under New York law if Lehman knew that they were illegal under Chinese law or was deliberately ignorant of that fact. *See Rutkin,* 229 F.2d at 255–56; *Dornberger,* 961 F.Supp. at 533–35; *cf.* Restatement (Second) Conflict of Laws § 202 cmt. c (reporting that the existence of illegality in a contract is usually determined by the law of the place of performance; the effect of that illegality is usually governed by the law determined under choice-of-law rules).

The Defendants argue that Lehman entered into the FX and swap contracts with Non–Ferrous with a view to violate Chinese law. They state that Chinese law required that Non–Ferrous obtain a license from the SAEC before engaging in any FX and swap trading. Non–Ferrous had no such license. The Defendants also assert that Lehman knew fully that Non–Ferrous would require such a license before engaging in its transactions with Lehman. They argue that Lehman's failure to make any effort to ensure that Non–Ferrous was licensed demonstrates that Lehman deliberately violated, or deliberately ignored, Chinese law.

*1. Chinese Law*

The Defendants argue that under Chinese law during the relevant time period, 1992 to 1994, a State-owned enterprise such as Non–Ferrous needed a license from the State Administration of Exchange Control ("SAEC") before engaging in foreign exchange futures, spot, and option transactions. The Defendants argue that Non–Ferrous did not have such a license, and therefore the FX transactions entered into between LBCC and Non–Ferrous were illegal under Chinese law. They maintain that the swap transactions between LBSF and Non–Ferrous were illegal for the same reason.

Lehman argues that although Chinese law did require a license for certain foreign exchange activity during the relevant time period, those regulations did not cover the foreign exchange and swap transactions at issue in this case. Therefore, because Non–Ferrous could legally enter into its transactions with LBCC and LBSF without SAEC licensing, those transactions were legal under Chinese law.

■ An examination of applicable Chinese law during the 1992 to 1994 time period reveals extensive regulations governing FX and swap transactions. At that time, there were three laws that primarily governed transactions such as FX and interest-rate swaps: (1) the Provisional Regulations for Foreign Exchange Control of the People's Republic of China, promulgated Dec. 18, 1980, effective Mar. 1, 1981 (the "1981 Law"); (2) the Detailed Implementing Regulations Governing Violation of Exchange Control of the People's Republic of China, promulgated and effective Apr. 5, 1985 (the "1985 Law"); and (3) the Administrative Regulations on Spot and Forward Foreign Exchange Transactions by Financial Institutions on Behalf of Clients, promulgated and effective Mar. 5, 1988 (the "1988 Law").

The Court finds that these three laws formed a comprehensive regulatory scheme that governed the transactions at issue in this case. Under this regulatory scheme, a State-owned Chinese business entity such as Non–Ferrous would require a license from the SAEC to engage in FX future, spot, or option transactions, as well as interest-rate swap transactions. Because Non–Ferrous entered into these types of transactions without the proper governmental authorization, its agreements with LBCC and LBSF violated this Chinese regulatory scheme and were illegal under Chinese law.

### (a) The 1981 Law

The 1981 Law governs FX and foreign-currency related transactions by Chinese entities. It imposes restrictions on, and requires prior state approval for, Chinese entities to engage in such transactions. The 1981 Law evidences a broad attempt by the State to control the vast majority of economic activity that involves foreign currency. *See* deLisle Reply Aff. Ex. 1 (quoting a 1981 statement by the Director of the SAEC: "China is a socialist nation, all unit revenues and expenditure in foreign exchange must be included in state planning in order to strengthen the State's control over foreign exchange, [and] ensure the fulfillment of state economic plans.").

Article 1 of the 1981 Law states that the Law's purpose was to strengthen "exchange control," and to "expedite the national economic growth and safeguard the rights and interests of [China]." *See* deLisle Aff. Ex. A, art. 1. Article 2 defines foreign exchange as "[f]oreign currencies ... [s]ecurities payable in foreign currency ... [i]nstruments payable in foreign currency ... [and o]ther foreign exchange funds." *Id.* art. 2. The broad purpose of the 1981 Law and its expansive definitions suggest that all types of FX transactions and swap transactions are covered. Both the FX transactions and the interest-rate swap transactions Hu entered into seemingly fall under the category of "instruments payable in foreign currency," or at least under the catch-all category of "other exchange funds."

The 1981 Law provides that Chinese enterprises, operating either inside or outside of China, may only possess or use foreign exchange in accordance with plans approved by the State. *Id.* arts. 5–8, 11. The 1981 Law also gives the SAEC broad regulatory powers and discretion by naming it the "administrative organ in charge of exchange control," and declaring that "detailed provisions for the enforcement of these provisions shall be formulated by" the SAEC. *Id.* arts. 3, 31; *see* deLisle Reply Aff. ¶ 10. Such powers and discretion include the authority to implement and interpret the 1981 Law. *See* deLisle Reply Aff. ¶ 10.

### (b) The 1985 Law

The SAEC issued the 1985 Law pursuant to its authority under Articles 31 and 33 of the 1981 Law. *See* deLisle Aff. Ex. M, art. 1. In fact, the 1985 Law provides the "detailed provisions for the enforcement" of the 1981 Law called for in Article 33 of the 1981 Law. *See id.* Ex. A, art. 33, Ex. M, art. 1. Article 6 of the 1985 Law states that "[e]ngaging in foreign exchange operations without prior SAEC approval" is illegal because such activity "disrupt[s] financial stability." *Id.* art. 6(1). Article 7 lists various punishments for Chinese entities that engage in such illegal activity. *See id.* art. 7.

Article 6(1) of the 1985 Law appears to cover the types of FX and swap trades that Lehman and Non–Ferrous entered into through Hu. This view is shared not only by the Defendants' expert, but also by a high-ranking official of the SAEC. *See* deLisle Reply Aff. ¶ 12; Mangang Aff. § 1, at 1–2 (stating that a Chinese entity needed a license from the SAEC to engage lawfully in FX spot, forward, and option transactions, as well as interest-rate swap transactions, from 1992 to 1994). Under this law, Non–Ferrous needed prior SAEC approval for the transactions at issue in order for those transactions to be legal.

Unlike Lehman, this Court finds nothing in the 1985 Law that suggests that its provisions are limited to the "trading of physical foreign exchange inside of China." *See* Feinerman Aff. ¶ 37. The provisions of the 1985 Law do not limit the law's

application to activities inside of China—indeed, many of its provisions regulate activity outside of China. *See, e.g.,* deLisle Aff. Ex. M, arts. 2(3), 4(1), 4(2), 6(2). Lehman's narrow reading of the 1985 Law seems even less likely given the broad scope of the 1981 Law that the 1985 Law was enforcing.

### (c) The 1988 Law

The 1988 Law further demonstrates that Chinese law regulated FX forward and spot transactions and required specific governmental approval for Chinese entities to engage in such transactions. The 1988 Law was enacted to relax restrictions on forward and spot transactions. At that time, Chinese enterprises engaged in international business were losing money due to the fluctuations in certain foreign currencies. *See* deLisle Reply Aff. Ex. 7. As a result, the SAEC enacted the 1988 Law to allow certain authorized financial institutions to execute forward and spot trades for Chinese enterprises that had been hurt by the fluctuations in foreign currencies. *Id.* The 1988 Law expressly states that it was "formulated to hedge against exchange risks." *See* deLisle Aff. Ex. G, art. 1.

Although the 1988 Law focusses primarily on the requirements for brokers or other agents, it is relevant to the instant inquiry. The 1988 Law reinforces the requirements laid down in the 1981 Law and the 1985 Law for Chinese entities that wish to engage in transactions involving foreign currencies.

Under the 1988 Law, there are two ways a Chinese entity can lawfully engage in FX forward and spot transactions. According to Article 2, a "financial institution" wishing to engage in such activity must obtain SAEC approval.[10] *Id.* art. 2. If approval is not obtained, then the 1988 Law requires that a Chinese entity obtain prior SAEC approval of any FX forward or spot transaction by submitting an application and a copy of the proposed trade to the local SAEC branch. *Id.* art. 8. Once the trade is approved by the SAEC, the entity must then engage a state-authorized agent to execute the trade. *Id.* The 1988 Law therefore demonstrates that without approval from the SAEC, Hu's FX forward and spot transactions were illegal.

### (d) The 1994 Notices

Notwithstanding these three laws, Lehman argues that two notices issued by the Chinese government in 1994 (the "1994 Notices") were the first regulations that governed the types of transactions at issue in this case. Lehman claims that before these notices, no applicable law proscribed Non–Ferrous' ability to engage in its transactions with LBCC and LBSF. Therefore, because these notices came into effect after the relevant time period, Lehman argues that Non–Ferrous' trading was legal.

These 1994 Notices, however, appear to have been mere announcements that the Chinese government was going to begin strictly enforcing already existing laws that governed, *inter alia,* the trading of derivative financial products such as FX and interest-rate swap transactions, namely, the 1981 Law, the 1985 Law, and the 1988 Law. The first notice, the "State Council Notice," [11] lists a host of problems

---

**10.** Although the definition of "financial institution" is unclear, it is irrelevant because, as will be discussed below, Non–Ferrous never received any license of any kind to engage in any foreign-currency related trading.

**11.** The full title of this document is the "Notice of the General Office of the State Council on Transmission of the Request of the State Council Securities Commission for Instructions Concerning Several Opinions on Reso-

in China's futures market and states that the Chinese government needs to "crack down on all forms of illegal futures trading activities." *See* Feinerman Aff. Ex. B. The rest of the State Council Notice provides suggested methods to implement this "crackdown."

The second notice, the "Joint Notice,"[12] is more on point for the instant case. The Joint Notice states that Chinese business entities "have engaged in foreign exchange futures trading and foreign exchange margin trading without approval from [the required authorities]." *Id.* Ex. C. It then notes that "[t]hese kinds of illegal trading activities" have caused "a large number of economic disputes." *Id.* The Joint Notice stresses that "[u]nauthorized foreign exchange futures trading or foreign exchange margin trading . . . is illegal," and that under the 1985 Law, "to organize or participate in these kinds of trading . . . constitutes an act of disruption of the financial order." *Id.*

From the text of the 1994 Notices, it appears that the conduct in question was already illegal, so far as the Chinese government was concerned. The 1994 Notices were sent out to express the government's desire to enforce the provisions of the 1985 Law, among other already-existing laws. The 1994 Notices do not appear to have changed Chinese law, contrary to Lehman's assertion. Indeed, the Joint Notice states that certain of the types of transactions entered into by Hu were illegal under the 1985 Law.

Non–Ferrous did not have an SAEC license to engage in FX or swap trading. *See* Mangang Aff. ¶ 2.[13] Therefore, this Court finds that under the regulatory scheme established by the 1981 Law, the 1985 Law, and the 1988 Law, the transactions entered into by Non–Ferrous and Lehman were illegal in China during the relevant time period.[14]

### 2. Lehman's Intent To Violate Chinese Law

Although Lehman's agreements with Non–Ferrous were illegal in China, the Court finds that there is a question of fact concerning whether Lehman entered those agreements with "a view to violate" Chinese law. Lehman has argued that Chinese law did not require a license for the relevant transactions at that time. Yet, it appears that Lehman, or at least the individuals at Lehman who were involved with Non–Ferrous' FX and swap trading, believed at the time that a license was indeed required for those transactions.

Lehman states, however, that it believed that Hu and Non–Ferrous were acting in compliance with Chinese law. Hu and Non–Ferrous formally and informally represented to Lehman that they were permitted to trade in FX. Lehman reports that it openly conducted a seminar on foreign-currency options trading together with Hu and SAEC representatives, which further caused it to believe that Hu was in compliance with the SAEC. Moreover, Gan

lutely Halting the Uncontrolled Development of the Futures Market."

**12.** The full title of this document is the "Notice on Strictly Investigating and Handling Illegal Foreign Exchange Futures Trading and Foreign Exchange Margin Trading."

**13.** In ¶ 1, Mangang defines foreign exchange transactions to include interest-rate swaps. Therefore, ¶ 2's assertion that Non–Ferrous

did not have a license to engage in "foreign exchange trading" includes the interest-rate swaps at issue in this case. *See* Mangang Aff. ¶¶ 1–2.

**14.** Lehman apparently knew of the Chinese licensing laws. *See* R1. Ex. 7, Exs. 9–15 (deposition testimony of Lehman personnel evidencing their knowledge of the Chinese licensing requirements), Ex. 16, at 946.

Choo Yeao, a Lehman foreign currency salesperson, recalls vaguely that Hu showed him an SAEC authorization for FX trading. *See* P2. Ex. 1 at 38–39.

■ Nevertheless, Lehman failed to ensure Non–Ferrous' compliance by obtaining a copy of its SAEC license, as required in the ISDA Master Agreement. A series of Lehman employees connected to the transactions state that they each believed that someone else was responsible for obtaining the required copy of that license. The Defendants dismiss this as "a remarkable display of finger pointing." *See* Defendants' Mem. in Supp. at 15. This Court, however, is not in a position on summary judgment to weigh the credibility of Lehman's assertions. That is for the ultimate fact finder, not the judge on a summary judgment motion. Viewing the evidence in the light most favorable to Lehman, this Court finds that whether Lehman entered the agreements with a view to violate Chinese law is an issue of fact for trial.[15]

### C. IMF Agreement

The Defendants raise the issue of China's membership in the International Monetary Fund as further grounds for declaring that Non–Ferrous' agreements with Lehman are unenforceable. Article VIII § 2(b) of the Articles of Agreement of the International Monetary Fund ("IMF Agreement") states that a member nation may not enforce an exchange contract that violates valid exchange-control regulations of any other member. *See* IMF Agreement, *supra*, Art. VIII § 2(b). Because Non–Ferrous' unlicensed transactions with Lehman violated Chinese exchange-control regulations, the Defendants argue that those contracts are rendered unenforceable by Article VIII.

Lehman, however, points out that China did not accept Article VIII until 1996, well after the completion of the transactions at issue. *See* P2. Ex. 11 (containing an IMF press release announcing China's acceptance of Article VIII §§ 2–4, effective from December 1, 1996). Lehman therefore argues that Article VIII cannot apply retroactively to its 1992–1994 transactions with Non–Ferrous.

The Defendants argue that China was bound by Article VIII during the relevant time period, despite any understandings to the contrary by the Chinese government. They note that because the Republic of China originally joined the IMF in 1945, the current People's Republic of China was in "transitional status" under Article XIV until 1995. Therefore, as an IMF member, China remained bound by Article VIII, even though it did not accept that obligation until 1996.

■ Based on the parties' submissions, this Court cannot accept the proposition that China remained bound by the provisions of an international agreement without its consent. The Defendants' argument raises issues of international law that have not been sufficiently presented to this Court. The Court rules, therefore, that because China did not accept Article VIII of the IMF Agreement until after completion of the transactions at issue, Article VIII does not affect the enforceability of Non–Ferrous' agreements with Lehman.[16]

---

**15.** It is apparent to this Court that Lehman's failure to ensure Non–Ferrous' compliance with Chinese law was negligent, if not reckless. Whether Lehman's conduct evidenced a view to violate Chinese law, however, is a question of fact for the jury.

**16.** The Court also cannot accept the Defendants' argument that the relevant time, for IMF Agreement purposes, is the time when a contract is *enforced*, rather than when it is entered or performed. In support of this proposition, the Defendants cite cases from the 1960s involving Cuban contracts. At the

### D. The Guarantee Claim

Lehman has alleged as the third count in its Amended Complaint that Minmetals breached an agreement to guarantee Non–Ferrous' FX obligations to Lehman (the "Guarantee"). The Defendants move for summary judgment on this claim, arguing, *inter alia,* that Lehman cannot enforce the Guarantee because it was illegal under Chinese law. Lehman responds as it did before with respect to the FX and swap agreements: that any Chinese illegality is irrelevant because the parties selected Delaware law as the governing law of the contract.

■ Unlike before, however, this Court finds that Chinese law governs the Guarantee, thus rendering it illegal and unenforceable. As previously discussed, this Court is sitting in diversity in New York and thus must apply New York's choice-of-law rules to determine the law governing the Guarantee. *See Dornberger,* 961 F.Supp. at 530. New York has traditionally used a common-law approach to choice-of-law issues. *See Haag,* 9 N.Y.2d 554, 216 N.Y.S.2d 65, 175 N.E.2d 441; *A.S. Rampell,* 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371. · However, as noted previously, New York has modified its common-law approach to choice-of-law provisions that select New York law as the law governing a contract. *See* N.Y. Gen. Oblig. Law § 5–1401.

The FX and swap agreements specified New York law as the governing law for those agreements, and those agreements otherwise fell within the scope of § 5–1401.

As a result, this Court ruled that the selection of New York law was enforceable pursuant to § 5–1401. In the Guarantee, however, the parties selected Delaware law as the governing law. Because that choice-of-law selection is not governed by § 5–1401, this Court must evaluate that selection pursuant to New York's traditional common-law approach.

Common-law choice-of-law principles generally follow the concept of party autonomy and adhere to contractual choice-of-law provisions. However, the Restatement reports that a contractual choice-of-law provision is invalid under the common-law in either of the following situations: (1) where there is no reasonable basis for the parties' choice, or (2) where the application of the chosen law would violate a fundamental public policy of another, more-interested jurisdiction. *See* Restatement (Second) Conflict of Laws § 187(2).

The Court finds that enforcement of the choice-of-law provision in the Guarantee would violate a fundamental public policy of China. The Guarantee itself is illegal under Chinese law. Chinese law requires that a state-owned company, such as Minmetals, obtain SAEC approval before entering into any agreement that guarantees debts of foreign currency. *See* Xu Aff. ¶ 3; deLisle Aff. ¶¶ 21–25. Chinese law further requires that such a company register the approved guarantee agreement with the SAEC in return for a Foreign Exchange Guarantee Registration Certificate. *See* deLisle Aff. ¶ 24. State-owned companies undertaking such obligations "must strictly follow" these regulations. *See id.* ¶ 21.

time the contracts were entered into, Cuba was a member of the IMF. By the time the plaintiffs sought to enforce those contracts under the provisions of the IMF, Cuba had withdrawn form the IMF. The courts ruled that the IMF Agreement was no longer enforceable upon Cuba. *See Confederation Life Ass'n v. Vega Y Arminan,* 207 So.2d 33 (Fla.

App.1968); *Pan–American Life Ins. v. Blanco,* 362 F.2d 167 (5th Cir.1966). The fact that the IMF Agreement is not enforceable on a member *after* it withdraws does not mean that it is retroactively enforceable upon a newly joined member for the period *before* it joined, and thus this Court cannot agree with the Defendants.

China enacted these provisions pursuant to its public policy of strictly regulating its own currency markets as well as the extent to which Chinese companies become indebted in foreign currencies. This public policy plays a fundamental role in China's transition from a command economy to a more market-oriented economy. While the Court may share Lehman's desire for more rapid progress towards a more liberal economic model for China, it cannot be too dismissive of this transition period and the Chinese public policies that guide it.

This Court also finds that China is a more interested jurisdiction than Delaware with respect to the Guarantee. Virtually all of the significant activity in the underlying FX agreement occurred in China: Lehman went to China to solicit Hu's business;[17] Hu executed the agreements in question in China; Hu placed all of his trades from China; and Lehman regularly called Hu in China to discuss his trading activity and to make recommendations to him. Moreover, Hu executed the Guarantee itself in China, ostensibly to bind his Chinese parent company to Non–Ferrous' trading losses.

Delaware, in contrast, has virtually no contacts to this dispute, except for the parties' contractual selection of Delaware law in the Guarantee. LBCC is incorporated in Delaware. LBCC, however, is merely a booking vehicle for Lehman's FX transactions and has no offices or employees of its own. These Delaware contacts are not as significant as China's, and Lehman has not attempted to argue otherwise.

This Court therefore finds that because the choice-of-law provision in the Guarantee violates a fundamental public policy of a more-interested jurisdiction, namely, China, it is invalid under the common-law principles that guide New York's choice-of-law rules. Where there is no valid contractual choice-of-law provision, the common law looks to the law of the jurisdiction with the most significant contacts to the transaction, with particular emphasis on where the contract was negotiated and where it was performed. *See* Restatement (Second) Conflict of Laws § 188.[18]

For the reasons discussed above, this Court finds that China has the most significant contacts with the Guarantee. Lehman argues only that New York has more significant contacts to this dispute. Leh-

---

**17.** This solicitation is an important factor in deciding the forum with the most significant interest. *See Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos,* 756 F.Supp. 136, 141 (S.D.N.Y.1991).

**18.** Section 188 of the Restatement (Second) Conflict of Laws reads as follows:

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

Restatement (Second) Conflict of Laws § 188.

man maintained Non–Ferrous' FX account in a New York bank, some money involved in the dispute was transferred into and out of that account, and Non–Ferrous' account statements and confirmations were sent from New York. The vast majority of the trades, however, were executed from Lehman's offices in London and Hong Kong; very few were executed by Lehman's New York office. *See* R3. Ex. 1, at 76, Ex. 8, at 124, Ex. 3, at 811.

New York's contacts do not outweigh the contacts China has to the dispute. While it can be debated whether the underlying FX contract was primarily performed in New York, China, or the United Kingdom, this Court finds that the solicitation and negotiation of the FX agreement occurred primarily in China. Moreover, the Guarantee itself was executed by Hu in China. The Court rules, therefore, that Chinese law governs the Guarantee agreement.

Under Chinese law, illegal guarantee agreements such as this one are unenforceable. Contracts that are found to violate the laws of China are invalid, and void *ab initio*. *See* deLisle Aff. Ex. R ("Law of the People's Republic of China on Economic Contracts Involving Foreign Interest," effective 1985), art. 9, Ex. S ("General Principles of Civil Law of the People's Republic of China," adopted in 1986), art. 58; *see also id.* Ex. R, art. 7 (providing that foreign economic contracts that must be approved by State authorities are void unless and until they receive such approval).

Nevertheless, Chinese law provides a remedy for a party to an illegal contract if the invalidity was due to the fault of the other party to the agreement. *Id.* Ex. R, art. 11, Ex. S, art. 61. Where both parties are at fault, neither party is entitled to a remedy. *See* Feinerman Aff. Ex. F, at 6. The issue, therefore, is whether Minme-

tals, Lehman, or both were at fault under Chinese law in entering the Guarantee agreement.

■ This Court is not in a position on these summary judgment submissions to decide whether or not Minmetals or Lehman were "at fault" in relation to the Guarantee. Although the parties have extensively briefed the issue of whether Lehman was at fault under Chinese law in entering the FX agreement, they have not similarly apprised this Court of any fault in relation to the Guarantee.

Because the Court cannot rule at this time on the issue of fault under Chinese law, it also cannot rule on whether Lehman may have a remedy under Chinese law. The Court therefore reserves decision on Count Three at this time. The Court directs that once it has established a firm trial date, the parties are to submit briefs of no more than twenty pages on this issue as well as others addressed later on in this Opinion and Order.

### III. *Plaintiffs' Motion*

Lehman moves for summary judgment in its favor on its own claims as well as on the Defendants' fourteen counterclaims and eighteen affirmative defenses. The Court will treat Lehman's motion under the following thirteen headings: (A) Lehman's Contract Claims; (B) Illegality; (C) Hu's Authorization; (D) Contractual Counterclaims and Defenses; (E) Equitable Defenses; (F) Breach of Fiduciary Duty; (G) Aiding and Abetting Hu's Breach of Fiduciary Duty; (H) Negligence; (I) Negligent Misrepresentation; (J) Fraud; (K) Commodities Exchange Act; (L) Conversion; and (M) Remaining Defenses.

#### A. *Lehman's Contract Claims*

Lehman moves for summary judgment on its breach-of-contract claims against

both Non–Ferrous and Minmetals, Counts One, Two, Four, and Five of its Amended Complaint. Therefore, Lehman also seeks summary judgment on the Defendants' First Affirmative Defense, which alleges that Lehman has failed to state a claim. In their opposition to these motions, the Defendants move for summary judgment on Lehman's alter-ego liability claims against Minmetals. The Court denies summary judgment on each of these claims.

As the Court has already discussed, a question of fact exists concerning whether Lehman was aware that its agreements with Hu were illegal in China. If Lehman knew of that illegality, then it cannot enforce those agreements. This question of fact therefore precludes a grant of summary judgment in Lehman's favor on Counts One, Two, Four, and Five.

The Defendants move to dismiss Lehman's alter-ego claims against Minmetals, arguing that Lehman has failed to establish a basis for piercing the corporate veil between Non–Ferrous and Minmetals. In Lehman's bid to pierce that veil, it has presented evidence indicating that (1) Minmetals provided Non–Ferrous with $42 million, without observing accounting formalities, which Non–Ferrous used to pay Lehman, *see* Pl.Ex. 10; and that (2) the six-member joint committee that made the decision to breach Non–Ferrous' obligations to Lehman consisted of Cao and five Minmetals employees, *see* Pl.Ex. 8, at 6–9. The Defendants have presented evidence disputing both of these allegations.

 The Court finds that a question of fact exists regarding whether Lehman can assert its alter-ego claims against Minmetals, Non–Ferrous' corporate par-

ent. Lehman has raised evidence that could potentially show not only a commingling of assets between Minmetals and Non–Ferrous but also that Minmetals caused Non–Ferrous' breach of its contracts with Lehman. These elements would support a veil-piercing theory under New York law.[19] *See Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26–29 (2d Cir.1993). The Court, therefore, denies the Defendants' request to dismiss Counts Four and Five of Lehman's Amended Complaint.

### B. Illegality

Lehman moves for summary judgment on Non–Ferrous' Eighth Counterclaim, which seeks a declaratory judgment that Non–Ferrous' agreements with Lehman were illegal under Chinese law and thus unenforceable. The Defendants also assert the illegality and unenforceablilty of those agreements as their Sixth Affirmative Defense.

The Court has already discussed the legality and enforceability of Non–Ferrous' agreements with Lehman at length. The Court has ruled that those agreements were illegal under Chinese law. However, the Court has ruled that the enforceability of those agreements under New York law turns on the factual issue of whether Lehman entered them with a view to violate Chinese law. Non–Ferrous' Eighth Counterclaim and Sixth Affirmative Defense are therefore viable to the extent that they are in accordance with this Court's rulings on those issues.

### C. Hu's Authorization

Lehman argues that there is no question of fact concerning Hu's authority to enter

19. The Defendants argue that under traditional New York choice-of-law rules, Chinese law should govern the veil-piercing issue because both Defendants are incorporated in China. Nevertheless, the Court agrees with Lehman that New York law should apply, as provided in the contracts at issue. *See* N.Y. Gen. Oblig. L. § 5–1401; *supra* part II.A.

into the transactions at issue on Non–Ferrous' behalf. It therefore moves for summary judgment on the Defendants' First Counterclaim and Second Affirmative Defense. For the reasons that follow, summary judgment on these claims is denied.

For Non–Ferrous, as principal, to be bound by the acts of its agent Hu, it must have conferred one of three types of authority on Hu: (1) actual; (2) inherent; or (3) apparent authority. *See Graffman v. Delecea,* No. 96 Civ. 7270, 1997 WL 620833, at *3 (S.D.N.Y. Oct.8, 1997). To obtain summary judgment, therefore, Lehman must establish that Non–Ferrous conferred one of these types of authority upon Hu. The Court finds that Lehman does not.

Hu did not possess actual authority to enter the transactions with Lehman. Both Hu and Cao have stated that Hu's trading was entirely unauthorized. In addition, as a matter of law, a principal cannot confer actual authority upon an agent to act illegally. *See, e.g., Anglo–Iberia Underwriting Management Co. v. PT Jamsostek,* No. 97 Civ. 5116, 1998 WL 289711, at *3 (S.D.N.Y. June 4, 1998). Because Hu's trading agreements with Lehman were illegal under Chinese law, he cannot have entered into them with actual authority.

Similarly, Lehman cannot establish that Hu had inherent or implied authority to engage in the transactions at issue because an agent cannot have the inherent authority to commit an illegal act. An agent is inherently authorized to perform any act that is reasonably within the scope of his position. *See Marfia v. T.C. Ziraat Bankasi,* 100 F.3d 243, 251 (2d Cir.1996) (stating that implied authority "can be viewed as 'actual authority given implicitly by a principal' "). Because the execution of illegal agreements could not have reasonably been within the scope of Hu's position, he could not have possessed the inherent authority to enter into the agreements at issue.

In contrast, a principal drapes its agent with apparent authority by holding its agent out in such a way that causes a reasonable third party to believe that the agent is authorized to enter into the transaction in question. *See Hallock v. State,* 64 N.Y.2d 224, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178 (1984). Apparent authority depends upon outward appearances, and thus can exist even in the absence of actual authority. It requires the following two elements: (1) the principal must, by words or conduct, create an appearance of authority in the agent; and (2) the third party must reasonably rely on that appearance of authority. *See FDIC v. Providence College,* 115 F.3d 136, 140 (2d Cir. 1997). The "existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment." *Graffman,* 1997 WL 620833, at *4.

In this case, there is a question of fact concerning whether Lehman could reasonably rely on an appearance that Hu was authorized to enter into the transactions at issue. As discussed previously, whether Lehman knew that the transactions were illegal under Chinese law is a question of fact for trial. If Lehman knew, or even suspected, that Hu was acting illegally by entering those agreements, it similarly would have known or suspected that Hu could not have been authorized to enter into those transactions. This question of fact concerning Lehman's reasonable reliance therefore precludes summary judgment on the issue of Hu's authority.

### D. Contractual Counterclaims and Defenses

Lehman moves to dismiss the Defendants' Seventh Counterclaim and Ninth Affirmative Defense, which allege a breach of contract by Lehman with regard to the $42 million transfer. Lehman also moves to dismiss the Defendants' Ninth Counterclaim and Eleventh Affirmative Defense, which seek to reform the terms of the swap agreement. Finally, Lehman moves to dismiss the Defendants' contract-based affirmative defenses of waiver and lack of consideration, their Fifteenth and Tenth Affirmative Defenses, respectively. The Court shall address each of these in turn.

#### 1. $42 Million Transfer

 The Defendants allege that Non–Ferrous agreed to transfer $42 million to Lehman with the understanding that Lehman would hold the money in a high-interest safe deposit vehicle. They allege that Lehman breached this agreement by instead using the funds to repay Hu's FX and swap margin losses and to pay for the Thai bond repo, and by allowing Hu to transfer funds to an unrelated third party.

This Court finds that there was no such understanding between Non–Ferrous and Lehman. Any misunderstanding on Cao's part regarding the nature and purpose of the transfer was due to misrepresentations by Hu, not by Lehman. Because no such agreement existed between Non–Ferrous and Lehman, the Defendants' Seventh Counterclaim and Ninth Affirmative Defense are dismissed.

#### 2. Swap Agreement

 The Defendants allege that Non–Ferrous agreed to enter into a swap rela-tionship with Lehman based on Lehman's representation that the swap was a safe deposit vehicle that would pay a relatively high interest rate without risking a loss of principal. The Defendants therefore seek a declaratory judgment reforming the swap agreement to reflect that understanding so that Non–Ferrous may recover its principal with interest from Lehman. In addition, they assert this understanding as an affirmative defense against Lehman's claims under the swap agreement.

 A court may reform a written agreement based on one party's unilateral mistake where that mistake results from some fraud on the part of the other party to the agreement.[20] *See Allen v. West-Point–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991); *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986). As the Court discusses below with respect to the Defendants' general fraud claims, the Defendants' allegations of fraud in relation to the swap agreement raise a material issue of fact. *See infra* part III.J. Summary judgment on the Defendants' Ninth Counterclaim and Eleventh Affirmative Defense is therefore denied.

#### 3. Waiver

The Defendants allege as their Fifteenth Affirmative Defense that Lehman waived its rights under its contracts with Non–Ferrous. Lehman moves for summary judgment on this defense, arguing that the record shows only that Lehman consistently asserted its rights to payment under the agreements.

In order to maintain their claim for waiver, the Defendants must show some evidence indicating that Lehman intended to relinquish a known right under the

---

**20.** Non–Ferrous originally described these claims as based on theories of both unilateral mistake and mutual mistake. It has not con-tinued to argue or support a mutual-mistake theory, and thus the Court treats its claims as grounded in unilateral mistake.

agreements. *See Voest–Alpine Int'l Corp. v. Chase Manhattan Bank,* 707 F.2d 680, 685 (2d Cir.1983). The Court finds that the Defendants have not met their burden in this instance. The evidence before this Court does not tend to demonstrate any waiver on Lehman's part, notwithstanding any issue regarding Lehman's failure to mitigate its damages. The Defendants' Fifteenth Affirmative Defense is therefore dismissed.

### 4. Lack of Consideration

 The Court similarly finds that the Defendants have not met their burden of showing some evidence that indicates a failure of consideration in Non–Ferrous' agreements with Lehman. Lehman correctly argues that its substantial payments to Non–Ferrous as well as the potential for further payment under the agreements constituted sufficient consideration for those agreements. *See Kinley Corp. v. Ancira,* 859 F.Supp. 652, 657–58 (W.D.N.Y.1994). The Defendants' Tenth Affirmative Defense is therefore dismissed.

### E. Equitable Defenses

Lehman moves to dismiss the Defendants' "equitable" defenses, which allege that Lehman's claims are barred by (1) its failure to advise Non–Ferrous of the risks of the transactions with Lehman, (2) its unclean hands, (3) estoppel and equitable estoppel, and (4) laches. Lehman argues that these defenses should be dismissed because the Defendants cannot assert equitable defenses to Lehman's contractual claims, and because the Defendants have not supported these affirmative defenses with any evidence.

In support of these affirmative defenses, the Defendants have stated only that estoppel is a valid defense against contractual claims, and that equitable defenses are

available because Lehman itself seeks equitable relief in piercing the corporate veil between Non–Ferrous and Minmetals, citing *Levesque v. Kelly Communications, Inc.,* No. 91 Civ. 7045, 1997 WL 284984, at *1 (S.D.N.Y. May 29, 1997). However, the Court agrees with Lehman that the Defendants have provided no factual or legal support for these affirmative defenses in this case that would indicate the existence of valid triable issues. The Defendants' Fourth, Seventh, Thirteenth, and Fourteenth Affirmative Defenses are therefore dismissed.

### F. Breach of Fiduciary Duty

Lehman moves to dismiss the Defendants' Second Counterclaim and Third Affirmative Defense, which allege that Lehman breached its fiduciary duty to Non–Ferrous by its handling of Non–Ferrous' trading in the instant case. Lehman argues that because LBCC and LBSF acted as "principal-to-principal" counterparties to Non–Ferrous, they did not owe Non–Ferrous any fiduciary duties.

 Lehman correctly asserts that a fiduciary duty does not arise in the normal course of an arm's-length business transaction. *See Compania Sud–Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.,* 785 F.Supp. 411, 426 (S.D.N.Y.1992). Lehman also correctly notes that courts have held that a financial products dealer, such as LBCC or LBSF, normally does not undertake a fiduciary duty when it acts as a principal in transactions with an institutional counterparty in which no trading discretion is conferred. *See, e.g., Banca Cremi, S.A. v. Alex. Brown & Sons,* 132 F.3d 1017, 1038 (4th Cir.1997); *Procter & Gamble v. Bankers Trust Co.,* 925 F.Supp. 1270, 1289 (S.D.Ohio 1996); *Societe Nationale D'exploitation Industrielle des Tabacs et Alumettes v. Salomon Bros. Int'l Ltd.,* N.Y.

L.J., Feb. 24, 1998, at 26 (Sup.Ct. N.Y. County Feb. 23, 1998), *aff'd*, 268 A.D.2d 373, 702 N.Y.S.2d 258 (App.Div.2000); *State v. Morgan Stanley & Co.*, 194 W.Va. 163, 459 S.E.2d 906, 910 (1995).

As a result, Lehman argues that this counterclaim should be dismissed for the following two reasons: (1) Lehman and Non–Ferrous acted as principals in the transactions at issue, as noted on every confirmation that Lehman sent to Non–Ferrous, *see, e.g.*, Pl.Ex. 31, 38; and (2) Non–Ferrous retained sole discretion over its trading decisions.

■ The Court nevertheless finds that questions of fact exist concerning the relationship between Lehman and Non–Ferrous. At base, the existence of a fiduciary relationship is a factual question. It "cannot be determined 'by recourse to rigid formulas;' rather, 'New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first.'" *Scott v. Dime Sav. Bank*, 886 F.Supp. 1073, 1078 (S.D.N.Y.1995) (citations omitted), *aff'd*, 101 F.3d 107 (2d Cir.1996).

■ Courts in this District have found that a fiduciary relationship could potentially arise in a "principal-to-principal" arm's-length relationship based upon the degree of trust that exists in that relationship. *See Salomon Bros. v. Huitong International Trust & Investment Corp.*, No. 94 Civ. 8559, 1996 WL 675795, at *2 (S.D.N.Y. Nov.21, 1996); *de Kwiatkowski v. Bear Stearns Co.*, No. 96 Civ. 4798, 1997 WL 538819 (S.D.N.Y. Aug. 29, 1997). *Salomon Brothers* contained allegations that one of the parties to an "arm's-length contract" functioned as more than a traditional arm's-length counterparty. 1996 WL 675795, at *2. Judge Preska held that the allegations, if proven, could sustain a claim

that the counterparty had assumed a fiduciary duty. *Id.*

In *de Kwiatkowski*, the court held that even though the defendant-dealer was a principal-to-principal counterparty, it could owe a fiduciary duty to its FX trading customer if it was "actively involved in advising the plaintiff with respect to the placement of his investments and the risk or lack of risk of those investment choices." 1997 WL 538819, at *4. Judge Koetl held that there were questions of fact regarding whether a fiduciary relationship existed and regarding the scope of any such relationship. *Id.*

Based on the record before this Court, the relationship between Lehman and Non–Ferrous may not have been the garden-variety principal-to-principal arm's-length relationship that Lehman claims it was. A jury could reasonably find that Lehman assumed a fiduciary duty in its relationship with Non–Ferrous. Lehman solicited the business of Non–Ferrous, a company that was large yet unsophisticated in derivatives transactions. In fact, Non–Ferrous never had any experience in trading FX or swaps. Hu states that he informed Lehman that he had no experience in FX trading. *See* Hu Aff. ¶ 15. Along the same lines, there is evidence that Potter considered Non–Ferrous to be a customer "that [was not] so sophisticated." *See* R2. Ex. 120, at 199.

Furthermore, despite the statements on the confirmations that LBCC was a principal—which are not dispositive on this issue, *see Keenan v. D.H. Blair & Co.*, 838 F.Supp. 82, 89 (S.D.N.Y.1993)—Hu claims that nobody at Lehman ever explained to him what the concepts of counterparty or principal meant. *See* Hu Aff. ¶ 18. Instead, Hu believed that he and Lehman were on the "same team," and alleges that Lehman created this impression by representing that it would "look out" for Hu's

positions. *Id.* ¶¶ 29–31. In addition, Lehman was, according to Hu, Hu's only source of information about the FX and derivatives market. *Id.* ¶ 31.

The evidence indicates that Hu placed a great deal of trust in Potter. Hu states that he relied on Potter and other Lehman employees in making every decision related to FX or swap trading. *Id.* ¶ 30. Hu also states that he believed that Potter was "trustworthy and reliable." *Id.* ¶ 30.

Other evidence aside from Hu's own testimony confirms the high degree of trust that Hu had in Potter and demonstrates that Potter may have used this trust to influence Hu. When Hu was being courted by Lehman's swap personnel after entering into the first interest-rate swap, Potter intervened to protect Hu from risky investments. Potter told a colleague that he was confident that he could persuade Hu against entering into a swap restructuring because of his "very strong relationship" with Hu. His attempt to persuade Hu succeeded. *See* R2. Ex. 120, at 199, Ex. 122, at 212–13, Ex. 123, at 403–04. Potter also reported to his boss that Hu "trades cash FX and options, on our ideas." *See* R2. Ex. 25, at 14767.

■ The "very strong relationship" that Potter had with Hu was also noticed by others at Lehman who dealt with Hu. Sheng Yan, a Lehman swap salesperson, told Potter that he was impressed with the strength of Potters' relationship with Hu. *See* R2. Ex. 28, at 99. Together, all of these circumstances create a question of fact about the true nature of the relationship between Lehman and Non–Ferrous, and about the degree of trust that Hu placed in Potter. Summary judgment on the Defendants' Second Counterclaim and Third Affirmative Defense is therefore denied.

## G. Aiding and Abetting Hu's Breach of Fiduciary Duty

Lehman moves for summary judgment on Non–Ferrous' Third Counterclaim, which alleges that Lehman is liable for aiding, abetting, and inducing Hu's breach of the fiduciary duty that he owed to Non–Ferrous. Lehman argues that summary judgment is appropriate on this counterclaim because Non–Ferrous has offered no evidence that could establish Lehman's awareness of any such breach by Hu. The Court finds that summary judgment is not appropriate on this counterclaim.

■ To establish a claim for aiding, abetting, or inducing a breach of fiduciary duty, a party must show the following three elements: (1) the breach of a fiduciary duty; (2) that the aider/abettor knew of that primary breach; and (3) that the aider/abettor substantially assisted in the achievement of that primary breach. *See Samuel M. Feinberg Testamentary Trust v. Carter,* 652 F.Supp. 1066, 1082 (S.D.N.Y. 1987).

The Defendants have presented evidence that supports the first and third factors. Hu states that he traded without any authorization, thereby breaching his fiduciary duty to Non–Ferrous. Lehman could be found to have substantially assisted that breach by, *inter alia,* (1) soliciting Hu's business, (2) executing trades for Hu, (3) giving advice and recommendations to Hu, (4) transferring money into third-party accounts, and (5) failing to investigate properly whether Hu was in fact authorized to engage in the transactions at issue.

■ The issue, then, is whether the Defendants have sufficiently shown that Lehman knew of Hu's breach. As a general rule, this second factor requires "actual knowledge [of the primary violation], not mere notice or unreasonable unaware-

ness." *See Feinberg Trust*, 652 F.Supp. at 1082–83.

In certain cases, however, a third party can become obligated to investigate an agent's actions where there are indications that the agent's actions are suspicious in nature. A failure to investigate under such circumstances may result in the third party's liability for aiding and abetting the agent's breach of his fiduciary duty. *See Whitney v. Citibank, N.A., et al.*, 782 F.2d 1106, 1115–16 (2d Cir.1986) (upholding a trial court's finding that a third party could be held liable for aiding and abetting a breach of fiduciary duty for failing to investigate despite "red flags flying all over the place.").

This Court similarly finds that there were enough "red flags" in this case to create a question of fact. The Court finds that a jury could hold Lehman liable for Hu's breach based upon its failure to investigate Hu's many suspicious actions, including: (1) the transfers of profits to third-party bank accounts; (2) Hu's own execution of the Guarantee—which guaranteed his own trades; and (3) Hu's failure to execute the ISDA Master Agreement. Summary judgment for Lehman on this counterclaim is therefore denied.

## H. Negligence

Lehman moves to dismiss the Defendants' Fourth Counterclaim and Third Affirmative Defense, which allege that Lehman is liable to Non–Ferrous for negligence because it breached the duty of reasonable care that it owed Non–Ferrous. Lehman argues that this claim should be dismissed because it owed no such duty to Non–Ferrous.

The Court finds that a question of fact precludes summary judgment on this claim. The Court's finding that there is a question of fact concerning whether Lehman owed any fiduciary duty to Non–Ferrous also creates a question of fact concerning whether Lehman owed Non–Ferrous a duty of care. *See Huitong*, 1996 WL 675795, at *3 (stating that if "Salomon had some relationship to Huitong giving rise to independent fiduciary duties, including a duty of care, Huitong would be able to state a negligence claim"); *Scott*, 886 F.Supp. at 1080 (demonstrating that facts giving rise to a fiduciary duty also support a negligence claim). Lehman does not argue that it did not breach such a duty, if one ever existed. Because a jury must decide whether the relationship between Lehman and Non–Ferrous gave rise to a duty of care, Non–Ferrous' negligence claim cannot be dismissed as a matter of law.[21]

## I. Negligent Misrepresentation

Lehman moves to dismiss the Defendants' Sixth Counterclaim and Eighth Affirmative Defense, which allege that Lehman's conduct in this matter constitutes a claim for negligent misrepresentation. The linchpin for such a claim is that a "special relationship" exist between the parties. *See American Protein Corp. v. AB Volvo*, 844 F.2d 56, 63–64 (2d Cir. 1988). This relationship is akin to a fiduciary duty, but need not rise to that same level. *See Edrei v. Copenhagen Handelsbank A/S*, No. 90 Civ. 1860, 1991 WL 64201, at *6 (S.D.N.Y. Apr.18, 1991).

This Court has already held that there is a material issue of fact concerning

---

21. The Court's decision on this issue has avoided Lehman's objections to the creation of a duty of care based on Non–Ferrous' submission of expert reports. These reports purport to establish standards of care in the derivatives market, but Lehman objects, claiming that such evidence is inadmissible. The Court determines that this issue can be decided by motion in limine if Non–Ferrous intends to introduce such evidence at trial.

the existence of a fiduciary relationship between Lehman and Non–Ferrous. Therefore, there similarly exists a question of fact concerning the existence of a "special relationship" between them, since the standard for establishing a special relationship is less rigorous than the standard for establishing a fiduciary relationship.[22] Lehman's motion for summary judgment on the Defendants' Sixth Counterclaim and Eighth Affirmative Defense is therefore denied.

### J. Fraud

Lehman moves to dismiss the Defendants' Fifth and Thirteenth Counterclaims and Fifth Affirmative Defense, which allege fraud claims that include two classifications of fraud particular to the financial arena: unsuitability fraud and markup fraud. For the reasons that follow, the Court denies summary judgment with respect to the Defendants' general fraud claims, but reserves decision with respect to the unsuitability-fraud and markup-fraud aspects of those claims.

#### 1. General Fraud Claims

■ There are many questions of fact relating to the Defendants' general fraud claims, thereby precluding a grant of summary judgment. The Defendants have identified numerous examples of Lehman's conduct that a jury could consider material misrepresentations or omissions.[23] For instance, Hu claims that (1) the true nature of the risks of the transactions at issue were never revealed to him, see Hu Aff. ¶¶ 18, 29, 56, 78–79, 92, 95, that (2) Lehman coaxed him into FX trading by representing it as a way to make easy profits, see id. ¶ 15; R2. Ex. 30, at LM 808, 858, and that (3) Lehman misrepresented the swap transactions as safe investments to earn higher returns on the funds on deposit in Non–Ferrous' FX account, see Hu Aff. ¶¶ 76–78.[24]

The Court also finds that there are questions of fact concerning the other elements of fraud—reliance, scienter, and loss. Hu's claim that he engaged in the trading activity in this case based on Lehman's representations, advice, and recommendations establishes a question of fact concerning his reliance. Id. ¶¶ 101–02. The Court also rejects Lehman's claim that Non–Ferrous was too sophisticated to have justifiably relied on any such representations. The Court has already determined that a jury must decide the level of Non–Ferrous' sophistication in determining whether Lehman owed it a fiduciary duty.

■ Scienter is generally a question of fact that can be proved with circumstantial evidence. See SEC v. Hasho, 784 F.Supp. 1059, 1107 (S.D.N.Y.1992). In this case,

---

**22.** Lehman asserts in its Reply Memorandum of Law that under New York law, Non–Ferrous' negligence and negligent misrepresentation claims are barred by the Martin Act. Non–Ferrous has not had the opportunity to respond to this argument. Therefore, the Court will not address this argument. The parties should brief this argument in their pre-trial materials.

**23.** Although an omission is actionable only when the party has a duty to disclose the omitted facts, See, e.g., Press v. Chemical Investment Servs. Corp., 988 F.Supp. 375, 384–87 (S.D.N.Y.1997), aff'd, 166 F.3d 529 (2d Cir.1999), the Court has already held that the duties Lehman owed to Non–Ferrous must be determined by a jury. Therefore, Non–Ferrous' fraud claims based on omissions can proceed.

**24.** There are other instances upon which Non–Ferrous relies, but the Court does not see the need to spell out each claimed misrepresentation. The examples cited by the Court are indicative of the misrepresentations or omissions that may be presented at trial, and are sufficient to create a question of fact.

scienter can be inferred from, *inter alia,* Potter's admission that Non–Ferrous "[was not] so sophisticated," *see* R2. Ex. 120, at 199, and from certain phone conversations in which Potter expressed anger at the swap group's attempt to take advantage of Hu. *See id.;* R2. Ex. 24, at 591.

■ Lehman maintains that summary judgment on the fraud counterclaims is appropriate because Non–Ferrous' trading losses were caused by rising interest rates in 1994, not by any alleged misrepresentations on Lehman's part. The causation element to a fraud claim is an issue of proximate causation, which is a question of fact. *See Bank Brussels Lambert v. Chase Manhattan Bank, N.A.,* No. 93 Civ. 5298, 1996 WL 609439, at *5 (S.D.N.Y. Oct.23, 1996). In the instant case, there is sufficient evidence for a jury to conclude that Non–Ferrous' losses were the foreseeable result of Lehman's misrepresentations.

### 2. Unsuitability Fraud

■ An unsuitability fraud claim is a subset of an ordinary § 10(b) fraud claim. *See Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1031 (2d Cir.1993). To establish a claim for unsuitability fraud, a party must demonstrate the following five elements:

(1) that the securities purchased were unsuited to the buyer's needs; (2) that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs; (3) that the defendant recommended or purchased the unsuitable securities anyway; (4) that, with scienter, the defendant made material

misrepresentations (or, owing a duty to the buyer, failed to disclose material information) relating to the suitability of the securities; and (5) that the buyer justifiably relied to its detriment on the defendant's fraudulent conduct.

*Id.*

■ An unsuitability claim requires, as a threshold, that a "security" be involved.[25] *Id.* The unsuitability claim in this case stems from Lehman's alleged failure to inquire into suitability. Therefore, if a security was not involved in the transaction and Lehman had no duty to inquire into suitability, then its failure to do so cannot be actionable.

■ The submissions to this Court do not adequately address whether the transactions at issue were securities. Although it seems clear that the FX transactions were not securities, there is a dispute about the swap transactions, and there are merely allegations about the NCDs. The Court therefore reserves judgment on the unsuitability fraud claim.

■ The Court directs the parties to address this issue in the briefs described in part II.D of this Opinion and Order. The parties should address whether the FX transactions, the swap transactions, and the NCD's were securities, thereby allowing an unsuitability fraud claim to proceed. In the event that some of the transactions at issue can proceed under this theory, the parties must address whether any questions of fact preclude summary judgment on this claim.[26]

25. It may be the case that under the common law, an unsuitability claim for fraud may be sustainable even if a security within the meaning of federal law is not involved. The cases cited, however, only involve securities, and the category of unsuitability fraud arose out of a § 10(b) claim under the Securities Exchange Act, 15 U.S.C. § 78j(b).

26. Similarly, the Court reserves decision on Non–Ferrous' Thirteenth Counterclaim because that counterclaim is brought under federal securities law. The briefs ordered herein should also address whether Non–Ferrous' Thirteenth Counterclaim can proceed to trial.

### 3. Markup Fraud

■ Non–Ferrous claims that Lehman's failure to disclose the excessive markup it charged on the transactions at issue constitute a claim for fraud. Again, the parties have not adequately addressed the issue of whether such a claim can stand if a "security" was not involved. Therefore, the parties are to include arguments on the markup-fraud claims in the briefs referred to in parts II.D and III.J.2 of this Opinion and Order.

### K. Commodity Exchange Act

Lehman moves for summary judgment on the Defendants' claims related to Commodities Exchange Act, 7 U.S.C. § 1 et seq. ("CEA"), which allege that Lehman's conduct violated (1) CEA § 4b; (2) CEA § 4o; and (3) the Commodity Futures Trading Commission ("CFTC") Rules § 32.9 (17 C.F.R. § 32.9). For the reasons that follow, Lehman's motion is granted only as to the Twelfth Counterclaim alleging a violation of § 32.9 of the CFTC Rules. Its motion for summary judgment on the Tenth and Eleventh Counterclaims and the Twelfth Affirmative Defense is denied.

### 1. Commodity Exchange Act § 4b

Non–Ferrous alleges as its Tenth Counterclaim that Lehman violated § 4b of the CEA by engaging in wilful deception, fraud, and cheating with respect to the FX and swap transactions in this case. Lehman argues that summary judgment is appropriate on this counterclaim and on the Defendants' Tenth Affirmative Defense because (1) the FX transactions are exempt from the CEA, and (2) the swap transactions are not covered by the CEA because they were principal-to-principal transactions.

Lehman argues that under the Supreme Court's decision in *Dunn v. Commodity Futures Trading Comm'n,* 519 U.S. 465, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997), the FX transactions at issue are exempt from the CEA because they fall under the Treasury Amendment to the CEA. The Treasury Amendment exempts "transactions in foreign currency ... unless such transactions involve the sale thereof for future delivery on a board of trade." 7 U.S.C. § 2(ii) (1994). In *Dunn,* the Supreme Court held that FX options are "transactions in foreign currency" within the meaning of the Treasury Amendment. *Id.* at 469, 117 S.Ct. 913. The *Dunn* Court, however, did not clarify the meaning of the term "board of trade."

In this case, it is undisputed that the FX transactions at issue were transactions in foreign currency, but whether the transactions were conducted on a board of trade is in dispute. The definition of the term "board of trade" is ambiguous. *See Rosner v. Peregrine Finance Ltd.,* No. 95 Civ. 10904, 1998 WL 249197, at *4 (S.D.N.Y. May 18, 1998); *Commodity Futures Trading Comm'n v. Frankwell Bullion Ltd.,* 99 F.3d 299, 304 (9th Cir.1996). This ambiguity forces the Court to turn to the legislative history of the Treasury Amendment to determine the true meaning of the phrase "conducted on a board of trade."

In answering this question, two district courts within the Second Circuit found that the legislative history behind the Treasury Amendment indicates that the Amendment was intended not to apply to all "off-exchange" transactions, but only to off-exchange interbank transactions. *See Rosner,* 1998 WL 249197, at *5; *Commodity Futures Trading Comm'n v. Standard Forex, Inc.,* No. 93 Civ. 0088, 1993 WL 809966, at *10–11 (E.D.N.Y. Aug. 9, 1993). Under this interpretation, the phrase "conducted on a board of trade" encompasses more than just transactions conducted on formally organized futures exchanges, i.e.,

157

"on-exchange" transactions. It also encompasses trades that were made off-exchange, i.e., not on an organized futures exchange, as long as the transactions were not conducted between two banks. *See Rosner*, 1998 WL 249197, at *5; *Standard Forex*, 1993 WL 809966, at *10–11.

■ The Court agrees with this interpretation of the legislative history behind the Treasury Amendment.[27] The FX transactions at issue were off-exchange but were not "interbank" transactions. As a result, they are not covered by the Treasury Amendment.[28]

Lehman's only other argument for summary judgment is that § 4b of the CEA does not apply to principal-to-principal transactions. The Court has already found that material issues of fact exist concerning whether the transactions in this case were truly principal-to-principal arm's-length transactions, or whether Lehman took a more active role in its relationship with Non–Ferrous. Therefore, summary judgment is not appropriate on this basis.

### 2. Commodity Exchange Act § 4o

Non–Ferrous alleges in its Eleventh Counterclaim that Lehman violated § 4o of the CEA by engaging in a scheme or

artifice to defraud Non–Ferrous in connection with the FX and swap transactions at issue. Lehman argues that summary judgment is warranted because it did not serve as a Commodity Trading Advisor ("CTA") in those FX and swap transactions.

■ Under the CEA, a CTA is one who is "in the business of advising others on the value or advisability of trading … of futures contracts or options," i.e., an investment advisor. *See Procter & Gamble Co. v. Bankers Trust Co., et al.*, 925 F.Supp. 1270, 1287 (S.D.Ohio 1996) (quoting *FDIC v. Hildenbrand*, 892 F.Supp. 1317, 1324–25 (D.Colo.1995)). Lehman maintains that any advice or opinions it gave Non–Ferrous were offered incidentally to their trading relationship. Lehman states that it never offered advice or opinions in return for compensation.

■ The Court has already held that the exact nature of the relationship between Lehman and Non–Ferrous, as well as the extent of Lehman's advice and recommendations to Non–Ferrous, are issues for a jury to resolve. A jury might find, for instance, that the pamphlets and other advisory material Lehman supplied to Hu qualifies Lehman as a CTA in that rela-

---

**27.** For a full discussion of this legislative history, *see Rosner*, 1998 WL 249197, at *4–5; *Standard Forex*, 1993 WL 809966, at *7–11. The Court adopts the logic of these well-reasoned discourses on the legislative history of the Treasury Amendment.

**28.** Lehman cites two cases that have reached the opposite conclusion after analyzing the legislative history behind the Treasury Amendment, *Frankwell Bullion*, 99 F.3d 299 (9th Cir.1996), and *de Kwiatkowski*, No. 96 Civ. 4798, 1997 WL 538819 (S.D.N.Y. Aug. 29, 1997). The Court finds the discussion in both of those cases unpersuasive. The *Frankwell Bullion* decision is from the Ninth Circuit, and therefore is not binding upon this Court. The Court simply disagrees with the

inferences the Ninth Circuit draws from the legislative history. The *Frankwell Bullion* decision interprets many of the same passages interpreted by the *Rosner* and *Standard Forex* courts, but reaches the opposite result. The *de Kwiatkowski* decision expands the scope of *Dunn* too far. In *de Kwiatkowski*, the court concluded that the phrase "conducted on a board of trade" only meant "on-exchange" transactions because any other interpretation would be "inconsistent with *Dunn*." 1998 WL 249197, at *6. As has been pointed out, however, *Dunn* never reached the issue of the meaning of the phrase "conducted on a board of trade," and therefore the Court finds the holding in *de Kwiatkowski* unpersuasive.

tionship. *See, e.g.,* R2. Ex. 29. Because a jury could find that Lehman served as a CTA through the advice and opinions it gave to Non–Ferrous with respect to these transactions, summary judgment is inappropriate.

### 3. Commodity Futures Trading Commission Rules § 32.9

 Non–Ferrous alleges in its Twelfth Counterclaim that Lehman violated § 32.9 of the CFTC Rules. Lehman correctly argues that summary judgment is proper because there is no private action for violations of CFTC rules. *See Fustok v. ContiCommodity Servs., Inc.,* 618 F.Supp. 1069, 1073–74 (S.D.N.Y.1985); *Procter & Gamble,* 925 F.Supp. at 1288; *Khalid Bin Alwaleed Foundation v. E.F. Hutton Co.,* 709 F.Supp. 815, 820 (N.D.Ill. 1989). Despite Non–Ferrous' arguments to the contrary, the Court finds that the "better reasoned rule of law is that § 32.9 is applicable only to CFTC enforcement actions and does not give rise to a private cause of action." *Procter & Gamble,* 925 F.Supp. at 1288. Summary judgment on this counterclaim is therefore granted to Lehman.

### L. Conversion

 Lehman moves for summary judgment on Non–Ferrous' Fourteenth Counterclaim, which alleges that Lehman is liable for conversion stemming from Non–Ferrous' loss of the $42 million in State Reserve Bank money. Under New York law, the tort of conversion requires a showing that a defendant exercised "unauthorized interference with plaintiff's ownership or possession of property." *See, e.g., Republic of Liberia v. Bickford,* 787 F.Supp. 397, 402 (S.D.N.Y.1992). Lehman's only argument in favor of summary judgment is that Hu's trading was authorized, and therefore the Defendants cannot

establish the unauthorized trading requirement. As previously discussed, Hu's authority to enter into these transactions on Non–Ferrous' behalf is a question of fact in this case. Therefore, summary judgment is inappropriate on this counterclaim.

### M. Remaining Defenses

### 1. Personal Jurisdiction

Lehman moves to dismiss the Defendants' Seventeenth Affirmative Defense, which alleges that Lehman's claims are barred because this Court does not have personal jurisdiction over the Defendants. Lehman argues, *inter alia,* that because Non–Ferrous specifically consented to the jurisdiction of this Court in the FX agreement, that provision should be enforced under N.Y. Gen. Oblig. Law § 1402.

 The Defendants, in response, merely state that disputed material facts exist, without identifying any evidence in support of that statement. The Court therefore finds that it has personal jurisdiction over the Defendants in this case. Non–Ferrous consented to the jurisdiction of this Court in its agreements with Lehman and engaged in commercial activity with New York corporations that occurred, in part, in New York. The Defendants' Seventeenth Affirmative Defense is therefore dismissed.

### 2. Twentieth Affirmative Defense

 Lehman moves for summary judgment on the Defendants' Twentieth Affirmative Defense, arguing that it "consists of nothing more than a grab-bag collection of adjectives and adverbs that recapitulate issues already addressed." Lehman's Mem. in Supp. at 35–36. The Defendants do not specifically address Lehman's motion for summary judgment on this defense. The Court agrees with Lehman, and therefore grants summary judgment

in its favor on the Defendants' Twentieth Affirmative Defense.

### *CONCLUSION*

Lehman's motion for summary judgment is granted in part and denied in part. The Defendants' motion for summary judgment is denied. The Court reserves decision on aspects of both sides' motions. Lehman may assert Counts One, Two, Four, and Five of its Amended Complaint at trial. Against these, the Defendants may raise the following affirmative defenses: the First, the Second, the Third, the Fifth, the Sixth, the Eighth, the Eleventh, the Twelfth, and the Sixteenth. Non–Ferrous may also assert the following counterclaims at trial: the First, the Second, the Third, the Fourth, the Fifth, the Sixth, the Eighth, the Ninth, the Tenth, the Eleventh, and the Fourteenth.

The parties are hereby given a ready for trial date of Wednesday, November 22, 2000. Any remaining discovery shall be completed by the close of business on Wednesday, October 11, 2000. Pre-trial materials, as listed in the memorandum attached to this Opinion and Order, are due by Wednesday, November 1, 2000. The Court directs that after it has established a firm trial date, the parties are to submit the briefs referred to in this Order and Opinion on the issues relating to Count Three, the Thirteenth Counterclaim, and the unsuitability and markup-fraud components of the Fifth Counterclaim.

**SO ORDERED.**